UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert MARSHALL, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Dennis EISCHEN, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald Lee MORGAN, Defendant-
Appellant.

Nos. 72–3195, 72–3185 and 72–3186.

United States Court of Appeals,
Ninth Circuit.

Sept. 7, 1973.

As Amended and Rehearing Denied in
No. 72–3195.

Feb. 1, 1974.

**1170**

Robert H. Lund (argued), Long Beach, Cal., for defendants-appellants Eischen and Morgan.

Major A. Langer (argued), of Demler, Perona, Langer & Bergkvist, Long Beach, Cal., for defendant-appellant Marshall.

Gregory C. Glynn, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before. DUNIWAY and ELY, Circuit Judges, and BURNS,* District Judge.

## OPINION

DUNIWAY, Circuit Judge:

The appealing defendants were tried, together with one Burkle, under an indictment charging them as follows: Count One, conspiring to distribute a quantity of amphetamine tablets in violation of 21 U.S.C. § 841(a)(1); count Two, possessing amphetamine tablets with intent to distribute, in violation of the same section; count Three, appellant Morgan only, possessing amphetamine tablets with intent to distribute, in violation of the same section. Each was found guilty under each count in which he was charged. We reverse.

### 1. *The appeals of Eischen and Morgan,*
### *Nos. 72-3185 and 72-3186*

Eischen and Morgan raise only one argument—that their motion to suppress all evidence discovered, including amphetamines and money, as the result of an entry into a house in which they were afterward arrested should have been granted. We agree.

These appeals present a distressing picture of the notions of the agents of the Bureau of Narcotics and Dangerous Drugs of the

---

*The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

Department of Justice who were involved in the case about the manner in which they are to perform their duties and their obligations toward citizens under the Constitution, and about their behavior toward the citizens with whom they become involved. We hope that the agents who testified in this case are not typical agents of the Bureau. If they are, we wonder what sort of training the Bureau gives its agents.[1]

Two of the agents seem quite willing to make false affidavits, in which facts are distorted to achieve a result, such as a finding that seized evidence was in plain view. One agent, when confronted with the facts demonstrating that his affidavit was false, did not admit that it was false; it was merely "inconsistent." These agents do not search a citizen; they "frisk" him, even if that involves fishing paper money out of his pocket and his wallet. Their fear for their own safety approaches paranoia. Even when 6 or 8 agents, all armed, have a group of citizens herded into a room, a search of a citizen's wallet is justified on the ground that it might contain a razor blade. These agents do not break into a house without a warrant; they "secure" it, even if this means rushing in with drawn guns, rounding up everyone in the place and searching them all. They do this for their own protection. They seem to think that every citizen must carry some sort of identity card or paper, which they call "I.D.", and must display it to them on demand.[2]

---

[1]The agents involved speak an almost impenetrable jargon. They do not get into their cars; they enter official government vehicles. They do not get out of or leave their cars, they exit them. They do not go somewhere; they proceed. They do not go to a particular place; they proceed to its vicinity. They do not watch or look; they surveille. They never see anything; they observe it. No one tells them anything; they are advised. A person does not tell them his name; he identifies himself. A person does not say something; he indicates. They do not listen to a telephone conversation; they monitor it. People telephoning to each other do not say "hello;" they exchange greetings. An agent does not hand money to an informer to make a buy; he advances previously recorded official government funds. To an agent, a list of serial numbers does not list serial numbers, it depicts Federal Reserve Notes. An agent does not say what an exhibit is; he says that it purports to be. The agents preface answers to simple and direct questions with "to my knowledge." They cannot describe a conversation by saying "he said" and "I said;" they speak in conclusions. Sometimes it takes the combined efforts of counsel and the judge to get them to state who said what. Under cross-examination, they seem unable to give a direct answer to a question; they either spout conclusions or do not understand. This often gives the prosecutor, under the guise of an objection, an opportunity to suggest an answer, which is then obligingly given.

[2]Throughout this opinion, we quote the reporter's transcript line for line, with all indentations, for reasons that will later appear. (This statement does not apply to transcript quotations in the footnotes.) Much of what we say is supported by the portions of the transcript that are later quoted in this opinion. We add here a few items from the testimony of agent Hoelker:

"Q. Well, did you go there to go in and search the house and search the people?

The relevant facts must be stated in some detail. One Williams, who was charged with violating the Illinois narcotics laws, agreed

A. We were sent there for the purpose of questioning the occupants of the house.

Q. Why did you start searching all of the people in there?

A. We asked them to produce proper identification.

Q. Oh, you searched Mr. Eischen completely top to bottom, didn't you?

A. That is correct.

Q. Why?

A. For weapons.

Q. Did you search everybody else in there for weapons?

A. We asked the young lady to properly identify herself. No search was made of her person.

Q. Did you search her purse?

A. That is correct.

Q. Was she trying to reach her purse or something?

A. We asked for proper identification. We wanted to make sure that we had proper identification.

Q. It is true, is it not, that you went to that place for the purpose of going in there and searching that residence and searching those people; isn't that correct?

A. That is not correct.

* * * *

Mr. Eischen was brought in. We asked him to produce proper identification. Mr. Willis and I then conducted a search of his person.

I retrieved Two-thousand Two-hundred Dollars ($2,200.00) of official advance funds from his person.

Part of the money was in the wallet and part of the money was contained in his right front pocket."

* * * *

Hoelker insisted that this search was a "frisk" for weapons, not a search.

"Q. Did you search Mr. Hogue on those premises?

A. Everyone was frisked for weapons.
Did I do it personally?
I do not remember.

Q. Did you search Mr. Berry?

A. I don't remember that.

Q. Did you search Mr. Eischen?

A. That, I did.

Q. Did you search Mr. Morgan?

A. That, I did.

* * * *

Q. What were those other people doing while you were doing all of this esearching? [sic]

* * * *

Mr. Morgan was the first man that I arrested.
Mr. Eischen was the second man I came into contact with.

* * * *

Q. Why did you ask these people to produce what you call proper identification when they were apparently in a private home? What caused you to think you had a right to do that?

A. I have a right to stop and require proper identification.

* * * *

to "cooperate" with the Bureau and to try to set up a buy of amphetamines from Burkle, with whom he had had previous dealings. The government flew Williams from Illinois to California. Williams telephoned Burkle, with agent Hoelker listening in, to try to arrange a buy. Burkle agreed to meet Williams at a hotel in Long Beach. Hoelker searched Williams and supplied him with $5,000. Williams and Burkle met, and then, watched by one or more of at least seven agents, they drove in Burkle's car to two different places, each of which they entered for a few minutes. Williams left the second place, met Hoelker, returned to the same place, and drove away with Burkle and a third person. Later Hoelker met Williams, who phoned Burkle with Hoelker listening. Hoelker also retrieved the $5,000.

The next day there were more such phone calls, overheard by Hoelker. Finally, there was a call in which Burkle said that "Things were finally put together," and Burkle and Williams agreed to meet at the All Six Motel. Hoelker and Williams and another agent went to the motel where Williams rented one room and Hoelker rented a room nearby. Hoelker again furnished $5,000 to Williams; he had made a list of the serial numbers of the bills. Williams was wired for sound, so that when Burkle arrived their conversation could be overheard and also recorded on tape. Hoelker went to a nearby car and watched. Burkle drove up in a Volkswagen Van driven by another person whom Hoelker had never seen. Burkle went into the motel alone and met Williams. The recording of their conversation is incomplete. However, Williams and Burkle agreed to a purchase and sale, Burkle to deliver the amphetamines to Williams in half an hour. He said that he could deliver "only three." "He [presumably Burkle's supplier] told me he had three," "he" being "Dennis." The listening agent testified that this meant three "kegs" each containing 50,000 pills, and that the price was to be $1,250 per keg. After Burkle left, Williams said "He's

---

Q. Mr. Hoelker, you use these words 'official advance funds'. Actually, this was money wasn't it?
A. That is correct.
Q. Just like any other money?
A. No, sir, it is not like just any other money.

\* \* \* \*

THE WITNESS: Are you asking me if I went to the cash register [in a store] and identified that bill and that serial number?
A. Yes.
I would retrieve it as evidence, yes, I would, and I could.
Q. And would you demand that that—whoever the storekeeper was, identify themselves to you?
A. That is correct."

It is to be remembered that the events described occurred in a private home, which the agents had entered without a warrant and without the consent of the occupants, as we show hereafter.

got the money. He's got a different car. The white van parked across the street."

A number of agents had been deployed near the motel to watch. Burkle left the motel, entered the van and it was driven to a residence on Hackett Street in Lakewood. Both Burkle and the driver of the van left the van and entered the residence. A few minutes later they came out again. Burkle was carrying a brown paper shopping bag. The two re-entered the van, and a short distance away they were stopped and arrested by several agents, including supervising agent Alden. The driver turned out to be appellant Marshall, who, up to that time, was unknown to the agents. On his person was a one hundred dollar bill, part of the money Hoelker gave to Williams. Burkle had $1,500 of the same money. The bag contained a quantity of amphetamines. The van had not stopped at any other place. The agents did not search the van to see whether more of the money was in it. During all of this time, agents had the residence under continuous watch.

At this point, the primary interest of the agents shifted from law enforcement to the recovery of $3,400 in "prerecorded official government funds." Agent Alden, who was in charge of the operation, testified as follows:

> "A After the arrest was consummated, approximately two blocks away from the residence on Hackett I instructed my agents to secure the residence[3] on Hackett, 4354, and to request the suspects concerning the missing official advance funds.
>
> \* \* \* \*
>
> Q When you directed your agents to go to that house, you did not anticipate there

---

[3]The agents' definition of the phrase "secure a residence" is both fascinating and disturbing.

Alden testified at some length on the subject:

"Q. And what do you mean by secure? Would you distinguish it from search?
A. Yes.
Q. Would you tell the court what the difference is?
A. To enter a residence and make sure—gather the people, get them together and make sure that—how do I explain it? I can explain search better.
Search would be to physically go through the house and go through each of the rooms, the closets, the cupboards—everything like that.
To secure is to bring under your control.
Q. Did you ever give directions that the house be searched?
A. No.
\* \* \* \*
When you secure a residence you have to make sure that you— you have to check all of the rooms to make sure there is no one hiding, you know, hiding in a closet with a gun at your back so you have to secure the whole residence and search individuals for weapons.

being anything of the nature of any illegal substance such as narcotics to be in that house, did you?

 A Personally—no.

 Q And what you were directing them to go and get was the Thirty-Four Hundred Dollars ($3,400.00) that you had not found on Burkle; is that correct?

 A No, not precisely.

 Q What did you send them there for?

 A To secure the residence and investigate with hopes of recovering the Thirty-Four Hundred Dollars ($3,400.00).

 * * * *

You cannot just go in one room and there are ten people in the other room. You have to secure the whole residence.

 * * * *

Q. Explain it to us, please, what did you mean by securing the residence?

A. To take control of it.

Q. And what do you mean by taking control of, then?

A. Take control of.

Q. Well, to take control of—but what did you mean for those men to do?

A. To take physical control of the residence.

Q. Outside and inside?

A. Yes—well, not outside, not the street, no.

Q. Well, as far as that house was concerned, then, you directed your men to go take control of the inside of that residence; did you not?

A. Yes.

Q. And by taking control of the inside of the residence, what did you intend for your agents to do?

A. What did I intend them to do?

Q. In other words, when you said to take control of the inside of that residence, what was your intent that they do?

A. Take control of it.

Q. By that, did you mean that they were to go there and with or without the consent of the people there go into the house and go into each room and look and see what they might see?

A. I didn't quite understand all of that?

 * * * *

I instructed them to secure the residence—take control, to enter the residence—to take control of the residence.

Whatever was necessary to take control of the residence.

 * * * *

Q. That means to go and to go into each room and look?

A. For their safety, yes.

Q. What do these things you are talking about 'their safety', you mean for them to do or not to do?

A. Do what?

Q. To go in there and look in each room and see what they can see.

A. Yes, that is part of the procedure when you take control.

Q When you arrested Mr. Burkle and Mr. Marshall and you give the directions to your men to go into that residence, is it true that the thing that you wanted them to find was the Thirty-Four Hundred Dollars ($3,400.00)?

A I hoped that we would recover the Thirty-Four Hundred Dollars ($3,400.00), yes.

Q And was your hope they would recover the Thirty-Four Hundred Dollars ($3,400.00) the reason why you sent them into that residence?

A Yes."

Agent Willis, who was one of the agents who went to the front door of the residence, testified:

"Q Did you go to those premises for the purpose of going in and seeing if you could find evidence?

A The prime reason for going to that residence, as I stated, the fact that during the arrest a certain part of the money which had been forwarded—advanced was only recovered and we knew that no one had left that house.

\* \* \* \*

Q Okay.

But didn't you decide on those premises to go in and get the money?

Q. And did you intend for them to go in there and search it?
A. Frisk.
Q. Frisk each person in the house?
A. Frisk."

\* \* \* \*

Agent Willis' testimony is similar.

"Q. What do you mean by 'secure'?
What is the different [sic] between secure and search?
A. There is a difference, sir.
Q. All right.
Now tell us about it.
You went there and you went with your guns and badges and you went in and searched all of the people and you went into all of the rooms and the closet, didn't you?
A. No, sir.
Q. You didn't?
A. No, sir.
Q. I asked you if you didn't sign an affidavit before you came here to the court with regard to this case?
A. An affidavit was prepared and I did sign one.
Q. All right.
The last sentence of that affidavit is, as I read it, that each room and closet was looked into to insure that no possible armed subjects remained at large.
Now, did you look into each closet in each room or not?
A. We looked into the closets. We didn't search the closets."

A Our reason for going there was to recover or to determine what had happened to the other part of the money which had been advanced.

Q And to recover it you went there to search the place to see where the money went, didn't you?

A We went there to secure and after entering—"

Agent Hoelker, the only other agent who testified, accompanied agent Willis to the door of the house. Here is what he said as to the agents' purpose:

"THE COURT: What did you go in there for, the purpose of doing what?

THE WITNESS: To recover Three-Thousand Four-Hundred Dollars ($3,400.00) of funds, which was missing from the original si xteen hundred. [sic]

\* \* \* \*

The conclusion of my contract with Mr. Eischen I had my Three-Thousand Four-Hundred Dollars ($3,400.00).

I was not concerned with anyone else because as previously stated, our main concern for going back to the residence was to obtain Three-Thousand Four-Hundred Dollars ($3,400.00).

\* \* \* \*

Q So you had no reason to believe that there was anything in that house you were looking for other than the marked money when you went into those premises, isn't that correct?

A That is important to me, the missing Three-Thousand Four-Hundred Dollars ($3,400.00).

\* \* \* \*

Q What were you doing in there searching these people in that private home?

A We were not searching the people in the private home.

We went to the 4354 Hackett Street address in an attempt to recover three thousand four hundred dollars of official advance funds which we determined was missing from the scene of arrest which transpired earlier when we arrested Mr. Burkle and Mr. Marshall."

The intent with which the agents approached the house is also clear. Alden testified:

"Q Mr. Alden, to secure a residence, when you told your men and you told them by radio to secure it, your orders included to enter the residence; did it not?

A Yes.

Q With or without the permission of the people there; isn't that correct?

\* \* \* \*

A Yes."

Hoelker said substantially the same thing:

"Q Really, Mr. Hoelker, truthfully do you have any thought in your mind that you would have left those premises and gone back up town without the money?

THE COURT: With what he knew?

BY MR. LUND:

Q With what you know.

A We would have probably entered the residence.

Q With or without consent?

A That is correct."

The agents did not have, and had not tried to obtain, a search warrant. They gave conflicting testimony as to whether they considered getting one. We first quote agent Alden:

"THE COURT: Let me ask you this why didn't you go and get a warrant?

THE WITNESS: Well there was a number of reasons.

First of all, we didn't know how many people were in the residence, therefore if we sat down outside and waited it would have taken many hours to get a search warrant. It would have taken us four, five, six, seven or eight hours, maybe longer.

You have this problem of people leaving the residence. You are going to detain them anyway and so it is our policy anyway to secure the residence to begin with."

On recross Alden testified:

"Q Mr. Alden, you consciously consider whether or not to get a warrant before you sent your men into that residence, didn't you?

A No.

Q You didn't consider whether to get a warrant or not?

A Not at that time, no. I did not have time to consider anything.

Q Well, let me read from your affidavit that is filed here on Paragraph Five.

'My instructions were given by radio.

'My decision to take this tack and authorize my agents to seek to question the occupants of 4354 Hackett Street rather than seek a search warrant was based principally upon two factors:

'The time was approximately 5:30 P.M. and the United States Attorney's office was about to close with only an emergency staff left on duty and a night duty magistrate. It would from experience take about six to eight hours to get a search warrant.

'The $3,400 in Official Advanced Funds was in highly imminent danger of being lost as evidence or even destroyed by the occupants unless some steps were taken to prevent such action.

'I believe this evidence would be lost in the six to eight hour period required to obtain a search warrant.'

Now, did you or did you not consciously consider getting a search warrant before you entered those premises?

A I don't know if I consciously did.

As a matter of policy I might have.

Q Then you decided you would let your men go in without one, is that right?

A Without a search warrant?

Q Yes.

A Yes.''

Here is what agent Willis said on the subject:

"Q Didn't you consciously waive [sic] whether or not to get a search warrant before you went to those premises?

A No, sir.

Q And didn't you consciously make a decision to go secure the premises without a warrant?

A During the narcotics arrest we can secure without a warrant to search.

\* \* \* \*

Q You didn't approach that door with the purpose of making an arrest of anybody inside that house, did you?

A We—the purpose for entering the house—the purpose for knocking on the door was to secure the house, not to search the house.

\* \* \* \*

The purpose, then was to go back to secure the residence. If it involved searching the whole house we had the attorney on the phone to get a search warrant, but it wasn't necessary.

\* \* \* \*

Q Mr. Willis, did you confer with Mr. Preger [the attorney] about getting a search warrant before you went back to those premises?

A No, sir.

Q Well, what did you mean when you said you had him on the phone?

A After entering the place everything was visible. The amount of money which had been advance [sic] was properly found in view. We informed Mr. Preger it was not necessary—at this point we knew that there were no more drugs—we felt there were no more drugs.

\* \* \* \*

A After assembling conversations in regard to whether or not the warrant was necessary, etc., and by finding the rest of the money which was not with the two defendants that was arrested, it was not necessary for a search warrant.

Q Well, Mr. Willis, do you fellows consider whether you needed a search warrant before you went into that house and because of what

you found in there is why you decided you didn't need a search warrant; is that correct?

A No, sir.

We had not been admitted to the residence by the individual who claimed he owned the place, we would have to obtain a search warrant."

With this background, we come to the actual entry into the house. Acting under Alden's order, a number of agents (the exact number does not appear, but it was eight to ten), together with one or more Lakewood policemen or County's sheriff's deputies, or both, converged on the house. Some went to the back; some may have been watching, but several went to the front door. Among them were agents Willis and Hoelker.

We first state Willis' testimony on the motion to suppress: The agents prepared to enter the house. Willis and agents Shoemaker and Hoelker and "several officers from the locals" went to the door. Shoemaker knocked. Willis testified:

"A After he knocked on the door there was a gentlemen [sic] who opened the door and he identified himself as being a Federal Agent and that we were there to—we had an investigation going and if he would mind if we would come in.

Q Did you have your gun out at this time?

A No

We had our badges out.

Q What response did you [sic] amake [sic] to this?

A I heard the response 'Come in'.

At this time, we rushed the door and we heard a running to the right of the hallway.

* * * *

And who went in with you?

A It was Agent Shoemaker, Agent Hoelker, myself and I think it was six or seven other people.

* * * *

Q Did you have a gun in your hand when you went in the front door?

A Yes, sir.

Q And why did you have that?

A Because during the noise when we went through the door.

Q That was—did you have your gun before you went in or as you went through or did you grab your gun as you went in?

▅▅▅▅▅▅▅▅▅

Just tell us how it happened.

A We had our badges out which we identified ourselves.

After the door was opened to secure we entered with our weapons.

Q With your guns out in your hands?

A Yes, sir.

Q And that is how you went in to secure the premises; isn't that correct?.

A After entering the places, the area and after asking everyone to maintain their present—their position where they were, all of the guns were put away.

Q But, I mean when you went in all of the guns were out as you fellows went through that front door, weren't they?

A Well, I know I had mine out when I went through.

* * * *

You had your gun in your hand?

A Yes, sir.

Q Was it down by your side or up?

A At this time I couldn't say. I imagine I had it forward.

* * * *

"Q When you got to the front door from the time that you made the statement that you made—from the moment that that door was opened—how long a time was it before you were in the living room of that house, in seconds?

A I can't—I didn't look at my watch and I can't say exactly how many seconds it was.

* * * *

To continue the investigation, we knocked on the door. We asked admittance at which time after entering for our own safety, the noises were heard, at which time the evidence was found."

* * * *

The other agent who testified was Hoelker, an ex-professional football player, sometimes known as "Boom Boom," who testified that he enjoyed what he was doing when he entered the house. On the motion to suppress, this is his testimony:

"Several agents and I approached the residence.

Agent Willis knocked on the
door of the residence. The door was opened.
We identified ourselves and I
identified myself as a Federal Officer.
Agent Willis identified himself
as a Federal Officer. The individual that opened
the door said, 'Come in'.

THE COURT: Who was it?
Who was it?

THE WITNESS: The individual
was identified to me to be William Lee Hoag.

\* \* \* \*

I immediately
stepped into the door.

After I stepped in the door
I heard the sound of people running in the house.
Also to my immediate
right and to my rear there was a door which slammed.
I reacted to that door, tried the door. The door
appeared to have something behind it. In other words,
it didn't open freely.

I forced the door. I did not
break any trim or anything but exerted force against
the door."

In response to questions by the court, here is what he said.
"When you heard the door slam,
were you in fear of your life or bodily safety?

THE WITNESS: Yes.

THE COURT: What did you think
was happening?

THE WITNESS: That there was
someone in the room.

I had no idea what that
individual was doing but I reacted to investigate.

THE COURT: For what purpose?

THE WITNESS: For my safety,
for the safety of the occupants of the house and for
my fellow agents safety."

He had his gun in hand when he went to the door.

Hoelker was seriously impeached. We are concerned primarily
with the entry into the house, but it is necessary to consider
what happened next to show the impeachment. He said that after
he forced the closed door on his right, he found Morgan in the
room. On the bed was a brown paper sack, and in it were plastic
bags, which contained 14,000 pills like those found in the van.

Also on the bed was a plastic bag containing $2,670. On the floor was $1,200 of the money he had given Williams.

He `also said that he learned that Hoag was "the principal occupant of the residence," and that Morgan used the bedroom in question. He asked Morgan, but did not know whether that was before or after he gave Morgan a "Miranda" type of warning. On this issue, he testified both ways: When making a set speech, he said that it was after; when quizzed, he said that he did not know, possibly it was before. In response to the court's questions, he said that he took Morgan into the living room, that he warned him there, and that Morgan made no statement.

Later, he "frisked" Eischen in the living room, and found $2,000 of the money he had given Williams, some in his pocket, some in his wallet which Eischen produced in response to a demand for an "I.D."

On cross-examination, he was confronted with an affidavit which he had previously presented to a Magistrate, reading in part:

> "After announcing ourselves, we were admitted to the residence by William Lee Hoag.
>
> "At this time, noise was heard from the other individuals running in the house. Upon entering the residence I observed Ronald Lee Morgan and Dennis Eischen inside the residence.
>
> "I then looked through an open doorway approximately twenty feet from the front doorway of the residence and observed a pile of money and what appeared to me to be, from my previous experience amphetamine tablets in a clear plastic bag."

His explanation is this:

> "A The statement is inconsistent, sir.
>
> Q Yes, it is.
>
> A Very inconsistent. I tried to communicate a point which I failed to do at that time. I was asked at one time if, in fact, the individual which I arrested was ever in the house so the statement in that affidavit which states 'Did I' or I state where I observed

Mr. Eischen and Mr. Morgan in the house, was placee [sic] in there for that purpose to communicate the fact that they were actually in the house and I actually observed them in the house and that I actually arrested them.

Q Your affidavit says that you looked through an open door and saw it on the bed.

Now, you tell me in your testimony here that you heard a door slam then you tried to push on it and there was pressure on the other side, then you tried to force it open and then you saw Morgan and saw the bed.

THE WITNESS: My testimony is correct and the affidavit is incorrect.

It is an inconsistent statement.

I admit to an error.

THE COURT: All right.

THE WITNESS: May I explain the error of the second statement?

THE COURT: Yes, you may explain it.

THE WITNESS: I was amazed that the evidence was in open view on the bed.

I tried to communicate that fact, that is the only reason that the statement is there."

\* \* \* \*

Q Mr. Hoelker, when you filed that affidavit with the Magistrate, did you go in there and intentionally mean to file a false statement in your affidavit or was it because you didn't remember what had happened?

\* \* \* \*

THE WITNESS: I did not intentionally file an incorrect affidavit.

BY MR LUND:

Q Was it because your memory was faulty or you just didn't understand how to put the facts down in words and sentences of the English language?

A I failed to communicate the point which I was trying to make in the instances.

Q What kind of an education do you have.

A I have a Master's Degree, sir.

Q And where did you graduate?
A Craige [sic] University, Omaha.
Q What did you major in?
A Master's Degree in Secondary
Education.
Q And you don't know how to
express yourself in the use of the English words to
tell in the affidavit what you mean?
A I didn't get the best grades
in English, sir—in composition."

There was also further and detailed demonstration that Hoelker's affidavit was false, both as to his seeing Eischen and Morgan and as to his seeing the pills and money when he entered the house. Moreover, he did not know who answered the door, did not learn that Hoag was the principal occupant of the house, and did not know whose bedroom he found Morgan in. Willis flatly contradicted him as to which room it was. His testimony as to the interior layout of the house was false. In short, he was thoroughly impeached.

We note too that Alden's testimony about whether he considered getting a warrant is inconsistent with his affidavit, and that contrary to Hoelker's story, Willis testified that the money "was properly found in plain view," a statement that was obviously false. Plain view in Eischen's pocket and wallet?

The trial court denied Eischen's and Morgan's motion to suppress. We hold that this was error.

■■ A warrantless search of a house is *per se* unreasonable under the Fourth Amendment, Coolidge v. New Hampshire, 1970, 403 U.S. 443, 444–445, 91 S.Ct. 2022, 29 L.Ed.2d 564. There are a few "specfically established, and well defined exceptions" to this rule. Vale v. Louisiana, 1970, 399 U.S. 30, 35, 90 S.Ct. 1969, 26 L.Ed.2d 409. The government has the burden of showing by a preponderance of the evidence that one or more of these exceptions exists. Lego v. Twomey, 1972, 404 U.S. 477, 488–489, 92 S.Ct. 619, 30 L.Ed. 2d 618. In reviewing a judge's decision in such a case, we apply the "clearly erroneous" rule. United States v. Page, 9 Cir., 1962, (in banc) 302 F.2d 81, 85.

■■ The first ground on which the trial judge upheld the entry into the house is that there was a valid consent. Voluntary consent to a search is an exception to the warrant requirement. Schneckloth v. Bustamonte, 1973, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It must be voluntary, and voluntariness "is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 223, 93 S.Ct. at 2045. The trial court's finding of consent is based primarily on the testimony of Hoelker and Willis that whoever answered the door said "Come in." We

have serious doubts that those two words were spoken.[4] Apparently the trial judge had some doubt, too. As he put it, "[t]he Court finds this a difficult question. There are so many conflicts in testimony between the Government on the one side and the defendants on the other side—switches in testimony—lapse of memory by Government Agent—misidentification—assumptions as to who

---

[4]Only Willis and Hoelker testified as to the consent. Both of them said that the person who opened the door said "come in." Willis' statement, however, is "I heard the response 'come in'. *At this time we rushed the door."* (Emphasis added.) On cross-examination, in response to the question "Just tell us what happened," his answer was "We had our badges out which we identified ourselves. After the door was opened to secure we entered with our weapons." He did not then mention "come in."

Hoelker, too, said that the person who opened the door said "come in." However, when he repeated his story on cross-examination and in response to the court's questions he had to be reminded about the "come in." We quote some of his testimony:

"THE COURT: When you were at the door and knocked on it, you say somebody opened the door; is that correct?

THE WITNESS: That is correct.

THE COURT: Tell us, now, in great detail, as you remember, what happened.

THE WITNESS: Agent Willis and I and several other Bureau of Narcotics and Dangerous Drugs officers—Special Agents were in front of the house.

Agent Willis and I approached the front door.

Some of the other agents went to different areas around the residence. Others positioned themselves in front of the residence.

Agent Willis knocked on the door. I was standing to his immediate right.

The door was, in fact, opened.

And as soon as it was opened, we announced—identified ourselves, announced our presence and I stepped into the room.

THE COURT: Did you ask permission to go in?

THE WITNESS: Yes.

Permission was granted to enter.

THE COURT: Tell us what was said.

You didn't mention that. You just walked into the room, that is all I heard.

THE WITNESS: Agent Willis was doing the talking.

THE COURT: You walked in with a gun.

All right, who said what?

THE WITNESS: Agent Willis stated that he was a Federal Narcotics Officer, or words to that effect.

THE COURT: All right.

THE WITNESS: That we were conducting a narcotics investigation, or words to that effect, and the individual allowed us to enter.

THE COURT: Now, tell us what was said by anybody—everybody.

THE WITNESS: We had badges displayed.

THE COURT: Yes.

THE WITNESS: I announced myself as a Federal Narcotics Officer.

THE COURT: Yes.

said what." However, after citing the rule in *Lego v. Twomey, supra,* the court concluded: "I necessarily find, then, which I think as I must hear all of the evidence, that there is a preponderance—however slight it may be—preponderance of the evidence in favor of the Government on the question of consent."

■ Assuming, however, that the words "Come in" were spoken, we cannot uphold the finding that there was consent. We hold that the judge's finding is clearly erroneous, *i.e.,* we are convinced, after examining the whole record, that a mistake has been made. The agents were ordered to "secure" the house with or without consent, and to try to find the money. One of the principal actors, Hoelker, was thoroughly impeached. Moreover, the young man who answered the door was confronted by several

> THE WITNESS: I was conducting a narcotics investigation.
> THE COURT: Yes.
> THE WITNESS: I would like to ask the occupants of the place some questions and I stepped into the house.
> BY MR. LUND:
> Q. With your gun in your hand?
> A. That is correct, sir, although it was not pointed directly at anyone.
> I hold my weapon at my side.
> THE COURT: All right.
> Have you told us all you can remember about what was said there as you got in?
> THE WITNESS: That is correct."

Thereafter the prosecutor came to the rescue and asked if he heard a conversation between Agent Willis and the person who answered the door.

> "Q. What was Agent Willis's conversation?
> A. Identifying himself as a Federal Agent, that he was also in the process of conducting a narcotics investigation and he desired to asks the occupants of the residence some questions.
> Q. What did the voice respond to agent Willis?
> A. The door was opened.
> I believe the response was to come in."

At another point, the following occurred:

> "THE COURT: Well, when you went in, did you tell them that you wanted to go in and search the house?
> THE WITNESS: No.
> * * * *
> THE COURT: Did you ask them in words or effect 'May we have permission or do you consent to our searching the house'?
> THE WITNESS: No reference was made.
> THE COURT: All right.
> Did you ask them in substance or effect 'Can we come into the house to look around'?
> THE WITNESS: We asked them in substance or effect if we could come into the house and question the occupants regarding Three-thousand Four-hundred Dollars ($3,400.00) of funds which belonged to the Federal Government.
> THE COURT: What did the man say?
> THE WITNESS: The response was 'Come in' after the door was opened."

agents—some with drawn guns, who were obviously determined to enter. The elapsed time between the opening of the door and the agents "rushing the door" was minimal, a few seconds. If in fact anyone said "come in," which we seriously doubt, we think that his doing so was in response to an overwhelming display of authority under the compulsion of the badge and the guns. This is not a voluntary consent. See *Johnson v. United States*, 1948, 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436; *Amos v. United States*, 1921, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654.

The second ground upon which the trial judge upheld the entry into the house is that the evidence sought—money or pills— would or could be disposed of in a hurry, and that therefore neither consent nor a warrant was required. This we treat as a finding that there were exigent circumstances such that the requirement that a warrant be obtained does not apply. See *Vale v. Louisiana, supra*.

 This finding, too, we hold to be clearly erroneous. None of the three agents who testified went to the house to look for, or expecting to find, any pills, nor was any of them in the least concerned that pills, if in the house, might be concealed, destroyed or removed. What they went for was the money. Alden's affidavit to the contrary notwithstanding, none of them considered obtaining a search warrant. In this respect, Alden contradicted his affidavit, which, like Hoelker's, appears to have been an after the fact attempt to construct a false rationale for what had been done. Even under some prodding by the prosecutor and the judge Alden would not testify to a belief that the missing money might be destroyed; the most that he feared was that it might be concealed or distributed.[5] There is no evidence that the occupants

---

[5] We quote Alden's answers to the court's questions:

"THE COURT: Let me ask you this, in connection with this raid or securing or whatever you want to call it, did you consciously consider or were you aware of the possibility that the money or the bills could be easily or readily destroyed as stated in your affidavit or is that just some language that a United States Attorney gave you that drafted up the affidavit?

THE WITNESS: Well, how long is Thirty-four Hundred Dollars ($3,400.00) going to remain?

It could be burned, it could be stashed somewhere, and also on my mind at the time the order that was placed was for a certain amount of evidence and the information that we had—that I had at the time was that we would receive all of the evidence with the Five Thousand Dollars ($5,000.00).

THE COURT: You mean, all of the bills?

THE WITNESS: All of the bills, yes.

At that time, right after the arrest was made, I didn't think there to be any more evidence—contraband in the house because we——

THE COURT: Well, then, your point was about the money, right?

of the house knew that it was being watched. No one had entered or left except Burkle and Marshall. They had been stopped two blocks away, out of sight of the house. They were in custody and had no way to communicate with the occupants. In short, there was no basis for a belief by the agents that there was an immediate danger that the money would be lost.

Moreover, the record does not show that a warrant could not have been promptly obtained. The agents had no trouble in getting the complaint deputy in the United States Attorney's office on the telephone *after* they entered the house, to tell him that they did not believe that they then needed a warrant. Presumably, they could have called him *before* they went in. The house was surrounded and being watched by eight or ten agents plus an undisclosed number of "locals," i.e., police or sheriff's deputies. If anything had been seen by them while waiting for a warrant that could lead them to believe that there was an emergency, we would perhaps have a different case. But this did not happen. If there were any "emergency," it was created by the agents themselves, when they knocked on the door.

The entry into the house was in violation of the Fourth Amendment. The motions to suppress evidence obtained in the house should have been granted.

2. *The Appeal of Marshall, No. 72-3195*

a. *Competency of counsel.*

Marshall's conviction must also be reversed, but for different reasons. As we have seen, his only connection with the case is that he drove the van, accompanied by Burkle, to the motel where

---

THE WITNESS: The point was about the money.

THE COURT: Well, in your affidavit there I gather you say that one of the things that was in your mind was the concern it would take so long to get a warrant was that the money was such it could easily be destroyed.

What were you talking about there?

THE WITNESS: Easily hidden or dispensed.

THE COURT: But the word that you used was 'destroyed'.

THE WITNESS: Well, destroyed—hidden—spread out—that is what I meant by it.

There was approximately, I guess, four to six people in the residence.

I don't remember, but some could have left—if one person left at a time and there goes all of the money."

We note that there is no evidence that, before the house was entered, Alden had any knowledge as to how many people, if any, were in the house. It may well be, although we need not decide this question, that if there was reasonable cause to believe that the money was in the house and if anyone left it, the agents could have followed him, stopped him for questioning under *Terry v. Ohio,* 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and, depending on what happened, either searched him or perhaps held him for search when the warrant arrived. Any such alternative, however, was eliminated by what the agents actually did.

the informer met with Burkle, waited in the van for Burkle, drove the van from there, accompanied by Burkle, to the Hackett Street residence, entered the residence with Burkle, left the residence with Burkle, who was carrying a shopping bag, entered the van with Burkle, and drove it away. On his person was found one $100 bill that Hoelker had handed to Williams.

■ Our first reason for reversing is that Marshall did not have the effective assistance of counsel. Burkle and Marshall were represented by the same retained counsel. Marshall's present counsel, who did not try the case, makes a broadside attack on the competence of Marshall's trial counsel. Much of it, we think, is without merit, and one claim, that counsel was incapacitated by alcohol, has been resolved against Marshall by the trial judge. Nevertheless, we do find that Marshall did not have effective representation.

Burkle's only possible defense was entrapment, and counsel, in a bumbling way, made the most of it. On the other hand, that defense was certainly not available to Marshall; nothing in the record indicates that he ever had any contact with any government agent or informer. His only possible defense was that he was an innocent victim who was asked by Burkle to drive but did not know anything about illegal activities. It was to his interest to put the whole blame on Burkle. Yet counsel seems to have had no realization that there was a conflict of interest between Burkle and Marshall. The result is that counsel devoted almost his entire effort to establishing that Burkle was entrapped, and Marshall became the forgotten man in the trial. In his oral argument, counsel spent almost all of his time to arguing that Burkle was entrapped. His few references to Marshall were merely incidental, and amounted to a confession of Marshall's guilt.

Counsel asked, on behalf of Burkle only, for an instruction on entrapment. In its instructions, the judge gave Devitt & Blackmar's instruction on entrapment. He prefaced it, however, as follows:

> "Now, the defendants Burkle and Marshall
> assert, and each of them asserts—you have to
> consider each of them separately, of course—
> that he may—you have to take each one separately,
> so I will say 'he' to each of those defendants —
> asserts that he was a victim of entrapment as to
> crimes charged in Count Two and Three in the indictment."

This must have hopelessly confused the jury as to Marshall's defense. Yet his counsel did not even notice this glaring error, much less suggest to the court that it be corrected.

In *Glasser v. United States*, 1942, 315 U.S. 60, 62 S.Ct 457, 86 L.Ed. 680, a case in which, over the objection of an appealing defendant, the court appointed an attorney to represent both him and a co-defendant, the Court stated the following principles:

". . . Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court. In conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant, it is especially important that he be given the benefit of the undivided assistance of his counsel without the court's becoming a party to encumbering that assistance. Here the court was advised of the possibility that conflicting interests might arise which would diminish Stewart's usefulness to Glasser. Nevertheless Stewart was appointed as Kretske's counsel. Our examination of the record leads to the conclusion that Stewart's representation of Glasser was not as effective as it might have been if the appointment had not been made. We hold that the court thereby denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment."

Similarly, in *Peek v. United States*, 9 Cir., 1903, 321 F.2d 934, 944, Judge Barnes said for this court:

"It is well recognized in the federal courts that the existence of a conflict of interest on the part of counsel representing two different defendants deprives the accused of the effective assistance of counsel."

See also *Sanchez v. Nelson*, 9 Cir., 1971, 446 F.2d 849, 850.

It is true that in Marshall's case, counsel was retained. That fact, however, at least in this case, is not a basis for upholding the judgment. We are committed to the proposition that, where counsel is competent, he, rather than his client, is the master of the lawsuit. See: *Kuhl v. United States*, 9 Cir., 1966, in banc, 370 F.2d 20, 27. We think that this proposition applies as much to appointed counsel as it does to retained counsel. But we have never held that the fact that counsel is retained is an absolute bar to the claim that a defendant did not have the effective assistance of counsel. This notion has been supported on two theories: (1) that the defendant has selected his own agent and is therefore bound by what his agent does, and (2) that, in state cases, what retained counsel does is not state action. We need

not consider the second theory, because this is a direct appeal in a federal case. The first theory breaks down in the face of the fact that most criminal defendants who can retain counsel are not in any position to judge the competence of the lawyer whom they hire. They have to take him on faith—in reliance on the fact that he has been admitted to practice. Unfortunately, that fact does not guarantee that he is competent to defend a criminal case. Most of the recent cases have held that competence of counsel is to be judged by the same standard, whether counsel be appointed or retained. See: *West v. State of Louisiana,* 5 Cir., 1973, 478 F.2d 1026, 1032 to 1034; *Goodwin v. Cardwell,* 6 Cir., 1970, 432 F.2d 521, 522. We agree, although we reserve to another time the question whether, in a particular case, a different standard may be applicable when counsel is retained from that which is applicable when counsel is appointed. We have considered the question of the effective assistance of counsel in at least one case where counsel was retained without differentiating between retained and appointed counsel. See *Joseph v. United States,* 9 Cir. 1963, 321 F.2d 710. At the least, we are committed to the proposition that a defendant "has a constitutional right to effective assistance of counsel." *Id.* at 714. See also *Barber v. Nelson,* 9 Cir., 1971, 451 F.2d 1017, 1019.

■ We deal here with a specific problem, conflict of interest. In this case, counsel did in fact "slight the defense of one defendant [Marshall], for that of another [Burkle]." *Sanchez, supra,* 446 F.2d at 850. The court's error in instructing the jury compounded the problem. That no one seems to have been aware of the conflict or the error does not save the conviction; rather, it emphasizes the fact that Marshall did not get the effective assistance of counsel to which he was entitled. See also *Brubaker v. Dickson,* 9 Cir., 1962, 310 F.2d 30, 38-39; *Craig v. United States,* 6 Cir., 1954, 217 F.2d 355, 359. *Holland v. Henderson,* 5 Cir., 1972, 460 F.2d 978, is closely in point. There, as here, retained counsel undertook to represent two defendants. There, as here, counsel neglected the defense of one in favor of that of the other. The court held that the neglected defendent was deprived of the effective assistance of counsel. Here is what the court said:

> "The duality of the representation afforded Holland was nothing more than the pro forma entry of an appearance as counsel. Effective counsel does not mean errorless counsel, but in the context of joint representation and inculpatory statements otherwise inadmissible to a particular defendant, the effectiveness of counsel must square with the court's reliance on counsel's engaging in full and effective cross-examination, *Nelson v. O'Neill, supra,* [1971, 402 U.S. 622; 91 S.Ct. 1723, 29 L.Ed.2d 222]; *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and the bar's reliance on his ethical sense to suggest employment of separate counsel. Notes on Professional Ethics, 55 Am.Bar/J. 262, March 1969;

Note-Criminal Co-defendants and the Sixth Amendment: The Case for Separate Counsel, 58 Geo.L.J. 369. A defendant may knowingly waive his right to separate counsel just as he may knowingly waive the assistance of any counsel, but where an attorney undertakes joint representation and foresees, or should have foreseen, conflicting duties to his clients, he *must* suggest separate counsel and make a sufficiently disclosure of the conflict that his clients may knowingly waive their right to counsel. Here counsel's failure in this duty, regardless of whether he was retained or appointed, was especially pernicious."

We agree, and we hold that the court's reasoning is fully applicable to this case. What is at stake here is the right of a defendant in a federal criminal case to a fair trial. Marshall did not get one.

b. *Instruction of the Jury*

There is a second reason why Marshall's conviction must be reversed. The reporter's transcript of the judge's instructions contains the following:

"These instructions compel a defendant
in a criminal case to take the witness [sic]
and testify, and no presumption of guilt
may be raised, and no inference of any kind
may be drawn from the failure of a defendant
to testify."

Marshall did not take the stand. Obviously, if the reporter's transcript correctly shows what the judge said, the instruction was highly prejudicial.

The instruction is quoted and assigned as error in Marshall's brief on appeal. This produced an immediate reaction from the trial judge. On his own motion, he made and filed a certificate, most of which is set out in the margin.[6] Copies of the certificate

---

[6]"I did not so instruct the jury as set forth in said paragraph and said transcript.

¶What I did do was instruct the jury from my 'JURY INSTRUCTIONS, CRIMINAL GENERAL' No. 18, Page 8 thereof, which is a direct quote from Devitt and Blackmar, Federal Jury Practice and Instructions, 2d ed., §12.10 'Effect of Failure of Accused to Testify' as follows:

'§12.10 Effect of Failure of Accused to Testify
The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn, from the failure of a defendant to testify.'

and a true and correct copy of my 'JURY INSTRUCTIONS, CRIMINAL, GENERAL' is attached hereto and the attention of the Court

were received by this court on March 9, 1973, ten days before counsel were to respond.

Counsel for Marshall did not respond; counsel for Eischen and Morgan responded in writing, stating that he did not recall what actual words the court used, but pointing out that "There is a Reporter's Certification that the transcript is a true and correct transcript of the proceedings." The reporter's certificate reads:

"I further certify that the foregoing 1435 pages are a true and correct transcript of the proceedings had in the above-entitled cause on ............., ......................................, 19............., and that said transcript is a true and correct transcription of my stenographic notes."

Neither counsel appeared on March 19, 1973. The reason why they did not is set out hereafter.

On April 20, 1973, the reporter sent to the Clerk of this court a revised page of the transcript, and a letter referring to the judge's certificate and the failure of counsel to object, and stating:

". . . per the District Court's order, I enclose herewith a new and corrected page 1271 of my Reporter's Transcript

of Appeals is respectfully drawn to Page 8, No. 18 where I have set forth the exact quote from §12.10, Devitt and Blackmar, Federal Jury Practice and Instructions, 2d ed. That is the instruction I gave to the jury.

It is obvious that the quote set forth on Page 42 of Appellant Marshall's Opening Brief, and in the Transcript at Page 1271, Lines 4 to 8, is clearly a typographical error and the instruction which I gave as set forth above was absolutely correct and neither confusing nor erroneous.

I have talked it over with my Court Reporter and she tells me that she failed to use my 'JURY INSTRUCTIONS, CRIMINAL, GENERAL' as a guideline and as a double check on her transcript which I had instructed her positively to do. She further tells me that the mistake is her responsibility, because she should have proofread the instruction she put in the transcript against my 'boilerplate'—'JURY INSTRUCTIONS, CRIMINAL, GENERAL' and she failed to do so."

The certificate also contains the following:

"Each of the Defendants and their respective counsel are hereby notified and each of you will please take notice . . . that if any of you have any reason whatsoever to doubt or disagree with the aforesaid certification you shall show cause before this undersigned trial Judge . . . on Monday, March 19, 1973, at 2 P.M. . . .

The Clerk is hereby directed to send copies of this Certification and Attachment to each of the aforesaid parties and attorneys, and to GREGORY C. GLYNN, the Assistant United States Attorney who was the prosecutor in the District Court and is the Assistant United States Attorney in charge of the matter in the Court of Appeals for the Ninth Circuit, so that they shall have notice of this Certification and Order to Show Cause, and also send the original and three copies of this Certification and attachment to the Clerk of the United States Court of Appeals for the Ninth Circuit, Hon. Dennis R. Mathews."

on Appeal, wherein I have followed the Court's order in said Certificate and have corrected lines 4 to 8 inclusive."

Nowhere does the reporter say that her transcription did not accurately reflect her notes, or that her notes are erroneous, much less that the judge did not say what her transcript shows or that he did say what he says in his certificate that he said.

The judge's certificate too, is puzzling. We are sure that the judge meant to say what he says he said and that he believes that he did say it, particularly because he was reading from a correct instruction. We know that he is far too competent to believe that the instruction as it appears in the transcript is correct, or intentionally to say what the transcript shows. We note, too, that neither counsel noted the error if it occurred, or called it to the judge's attention. We also know, however, that every lawyer or judge is occasionally astonished, upon reading a transcript, at what it shows that he said, but also chagrined to find, upon checking the reporter's notes or recording, that he did say it. It is a rare person indeed who does not occasionally suffer a slip of the tongue, when either speaking or reading. The judge's certificate does say that he did not instruct the jury as the transcript shows (see Rule 10(e) F.R.App.P.). But his reason is that he was reading from a correct instruction and that the reporter "failed to use my 'Jury Instructions, Criminal, General' as a guideline and as a double check on her transcript which I had instructed her positively to do." It does not state what her notes or recording (if any) show that he said. It bears an uncomfortably close resemblance to an order to the reporter not to report what was said to the jury, but to report what the judge had before him when he was reading his instructions to the jury. Yet it is what the jury heard that is important; the jury never saw the paper from which the judge was reading. In short, we are unable to determine from the record whether or not, in his oral instruction, the judge said "These instructions compel" . . . or "The law does not compel . . . ." If the former words were spoken, there is clear error.

### c. *The Controversy about the Reporter's Transcript*

At oral argument of the appeals, and in response to comment from the bench, we learned why counsel did not appear in response to the certificate of the judge.

Notices of the appeals were filed on August 7, 1972, and notice to prepare transcript was filed August 17. The reporter was paid $2,125, her estimated cost, on the same day. Following a long delay, counsel appealed to the judge, by letter dated December 5, for help in having the transcript prepared. The judge responded on December 7, stating that the reporter had been ill, but that "I am also assured that the transcript will be ready on Monday, December 11,

1972, since I have specifically ordered Mrs. Peterson to have it finished by such date." The transcript was filed December 11.

On December 14, the reporter sent to each counsel a bill, which is set out in the margin.[7] Under date of January 11, 1973, counsel for Burkle and Marshall responded by letter[8] to the reporter. On February 9, the judge signed and filed an "Order to Show Cause For Payment of Reporter's Fees" addressed to all defendants and their counsel, which we set out in the margin.[9] Under date of February 28, counsel for Eischen and Morgan sent the reporter $946.50. Both counsel appeared at the March 5 hearing. Because he had paid, counsel for Eischen and Morgan was excused. Counsel for Burkle and Marshall wished to be heard. We quote what happened to him:

> THE COURT: . . . .
> "Now, Mr. Langer. Where is your money?
>
> MR. LANGER: Your Honor, may I have a few moments to try to present my position in this case.
>
> THE COURT: Where is the money?
> MR. LANGER: I have a check with me, your Honor.
>
> THE COURT: How much.
> MR. LANGER: For the full amount.

---

[7]"Re: Transcript on appeal in the case of UNITED STATES OF AMERICA vs. BURKLE, et al., taken before Hon. A. Andrew Hauk:

| | |
|---|---|
| Orig. + 2 | $2,583.00 |
| 1 cc. counsel | 717.50 |
| 1 cc counsel (Mr. Lund) | 717.50 |
| | |
| Amount Due: | $4,019.00 |
| Deposit 8/17/72 | 2,125.00 |
| | |
| TOTAL BALANCE DUE: | $1,893.00 |

(One-half of this amount to be paid by you would be $946.50. . . ."

[8]"Regarding your bill, please be advised that I refuse payment for the following reasons:

The estimate was $2,500 which I secured from my clients for payment and which sum was paid. At this time, my clients do not have further funds to pay this bill and since I feel it is their responsibility and not mine, I suggest that you send your bills directly to them. However, since your excused or inexcused delay in preparation and filing the transcript caused me to file at least three motions to extend time to file the brief for which I had to charge my clients, I would advise them as well not to pay this sum.

Furthermore, I am curious as to why it is necessary for the typing in the transcript to start in the middle of the page at each paragraph rather than at some point reasonably close to the left hand margin, why the type is larger than standard and expanded and why

THE COURT: Pay it up.

MR. LANGER: May I have a few words?

THE COURT: After you pay it up or else you go to jail tonight until you pay it.

MR. LANGER: Your Honor —

THE COURT: I said to pay it up or I will send you to jail.

MR. LANGER: May I make my record?

THE COURT: After you pay it up.

Now, give it to the Reporter, not to me.

MR. LANGER: I have to sign it.

THE COURT: Oh, you have to sign it.

All right, sign it.

(Whereupon, the attorney complies with the request of the Court.)

THE COURT: All right, you can give it to the reporter.

MR. LANGER: Do I give it to the Clerk or —

THE COURT: How much is the check for?

Miss Reporter, go and check and make sure that the check is good. Go in the office and call to the bank and make sure that the check is good."

(Whereupon, the Reporter complies with the request of the court.)

---

you use 25-line paper rather than the standard 28-line. If this format is dictated by Federal Court rules, my questions are answered. However, I have never seen a transcript prepared in this fashion before and if we are charged by the folio, you can imagine the significant waste that is involved using your format."

9"YOU, AND EACH OF YOU, WILL PLEASE TAKE NOTICE that the Court, on its own motion has set the above matter on for an Order to Show Cause on Monday, March 5, 1973, in Courtroom 4 at 2:00 p.m., why you, and each of you, should not be held in contempt of court or otherwise disciplined, or why sanctions should not be imposed for your failure to pay the balance of the bill now due and owing to Court Reporter Phyllis N. Peterson for the transcript on appeal which you ordered and upon which you still owe her the sum of $1,893.00.

YOU ARE FURTHER NOTIFIED that you, and each of you, must be present in person at this hearing or the Court will issue a bench warrant for your arrest with the bond set in the sum of $25,000.00."

There follows a two-page lecture by the judge on why the lawyer should pay the reporter. Finally, the following occurred:

"MR. LANGER: That is not what concerns me at all.

THE COURT: What concerns you?

MR. LANGER: What concerns me is the manner in which the reporter's transcript was prepared, and that is what I would like to talk to the Court about.

THE COURT: The reporter has prepared it in accordance with the rules, so far as I can determine. And that is what I go by.

MR. LANGER: If I may —

THE COURT: I didn't make the rules.

MR. LANGER: I have an affidavit from Joseph O'Brien, a certified shorthand reporter for the Supreme Court of the State of California. He has been practicing for 18 years. He is a partner in the shorthand reporting firm of Middleton & O'Brien.

In his opinion—I would like to file this affidavit with the Court, if I may.

THE COURT: You can if you want.

MR. LANGER: I would like to.

THE COURT: The only opinion that would make any sense to me, that would be of any use to the Court, would be the opinion of a court reporter who has practiced in Federal Court, in the Central District of California, for a period of time.

MR. LANGER: In Mr. O'Brien's opinion the transcript was twice as large as it should have been because of the following factors:

One, she started halfway through the page. I have a copy of one volume of the reporter's transcript, which I would like to show the Court. I would like to know why —

THE COURT: I have seen them. I have seen them. I know how they start it.

MR. LANGER: I would like to know why it is necessary to start in the middle of the page instead of at the left-hand margin.

THE COURT: So it is easier to read.

MR. LANGER: And it also makes the cost approximately twice as much as it ordinarily would be.

THE COURT: I don't agree with you. I don't agree with you at all. Who is this fellow O'Brien?

MR. LANGER: I believe the affidavit says.

THE COURT: I have never heard of him. Whom did he practice before? You said the Supreme Court. They don't have reporters up there.

MR. LANGER: The Superior Court. Excuse me. The Superior Court.

He is qualified by the State of California for all courts, to practice in all courts.

THE COURT: I have never heard of him. I practiced over there for 25 years, and I was a Superior Court judge for two years.

MR. LANGER: Well, the affidavit shows that he —

THE COURT: You tell him I didn't even consider it.

I looked at it, and I consider it as totally inadequate.

\* \* \* \*

MR. LANGER: I would also like to point out that the reporter's transcript uses an other than normal type of type called the spread type rather than the usual pica type.

I would also like to point out —

THE COURT: The judges, the older judges, have insisted on the larger type. And I went along with it.

MR. LANGER: In my letter to Miss Peterson I asked her specifically if there were any specific court rules which required the use of —

\* \* \* \*

MR. LANGER: In that letter I asked her if this was a court rule. I asked if it was a court rule to start in the middle of the page. I asked her if it was a court rule to use 28 instead of — excuse me — 25 instead of 28-line paper.

I asked her if it was court rule to use spread type. And I said, 'Would you please answer this.'

I received no answer to that.

THE REPORTER: I called you.

MR. LANGER: I have an affidavit from my secretary regarding the conversation that she had with Mrs. Peterson. I would like to file that with the Court.

THE COURT: All right, file it if you want.

MR. LANGER: You say you spoke to me?

THE REPORTER: No.

He wouldn't even answer my phone calls.

MR. LANGER: Your Honor —

THE COURT: I know it. That is another thing. I ought to throw you in jail for not doing that, for not answering the phone calls of the reporter.

MR. LANGER: Your Honor, I have a letter dated December 5, 1972, which I had a copy of, which I sent to you. You have the original in your file, your Honor.

THE COURT: December what?

MR. LANGER: December 5, 1972, talking about answering phone calls.

THE COURT: December 5, 1972.

MR. LANGER: That is right. You answered my letter most graciously.

THE COURT: Here. Yes, I said there I admonished Mrs. Peterson to get this transcript finished, and I had been in the hospital, and that was one reason that I hadn't answered your letter sooner. All right.

\* \* \* \*

MR. LANGER: In that letter I pointed out that I had tried to call her over a dozen times, that I had spoken to everybody including a babysitter.

THE COURT: She was having a hysterectomy and she sent a doctor's certificate to this effect to the Court of Appeals.

Now, if you don't like what we do down here, I suggest you go up to the Court of Appeals.

MR. LANGER: It required three extensions to the Court of Appeals in order to get the brief filed.

THE COURT: I know it, and I am telling you why.

MR. LANGER: Now, as far as telephone calls are concerned, every phone call that I received from anybody, including Mr. Guerrero, your clerk, I answered.

THE COURT: She told me she called you several times and asked, 'What about the money? Get the money in.'

MR. LANGER: She never spoke to me, your Honor.

THE COURT: Is there anything else you want to file?

(To reporter) Did you check the check?

THE REPORTER: She is checking on it right now.

THE COURT: I want to be sure you get paid.

MR. LANGER: The affidavit filed by my secretary, who spoke to Mrs. Peterson, talks about the question of these court rules regarding starting in the middle of the page, et cetera.

I believe that affidavit shows she knew of no court rule but that she was following the format that the person before her had used.

Now, to me, and in my practice, this is an unusual type of format, to say the least. I think it is obvious, if you really look at the transcript —

THE COURT: I don't think it is unusual. Look at the rest of the Federal Courts. It is done exactly the way it is done in all the other Federal Courts in this district.

MR. LANGER: Then, respectfully, it is improper and it is a waste.

THE COURT: Overruled. I disagree with you. We are going to follow the rules of this Court.

MR. LANGER: I paid the money and I paid it under protest.

THE COURT: All right. You paid it. I want to make sure — You said you paid it under protest. That is why I want to make sure it clears.

MR. LANGER: It is going to clear.

THE COURT: I have taken it under protest. I want to be sure it clears. Mr. Marshall paid his not under protest. You are the only one I have ever had any trouble with.

MR. LANGER: This is the only time I ever had the problem your Honor.

THE COURT: For some six years I have been practicing here, and you are the first lawyer that tried to push it on to his clients, saying he didn't have any money, and that it is the client's fault.

MR. LANGER: That is not the problem, your Honor.

THE COURT: In fact, you told me you didn't have the money.

MR. LANGER: I know, and I am paying it out of my pocket.

THE COURT: All right. As I say, you are the first one that has ever done this.

THE REPORTER: It is clear.

THE COURT: He is not going to get away with it. The money has been paid. That is the end of it.

If you don't like it, go up to the Court of Appeals.

MR. LANGER: I intend to, your Honor.

THE COURT: (To reporter) You have got your money. That is the point.

THE REPORTER: Yes, sir."

We set out the O'Brien affidavit in the margin.[10]

Unfortunately the judge let his sympathy for the reporter and his annoyance at counsel get the better of his judgment. What he did is not consistent with what is expected of a federal judge. The Code of Judicial Conduct of the American Bar Association,

---

[10]"JOSEPH A. O'BRIEN, being first duly sworn, deposes and says:

I am a certified shorthand reporter. I worked as official court reporter for the Superior Court, County of Los Angeles, for eighteen years. For the past ten years, I have been a free-lance court reporter and owner of Middleton & O'Brien, Court Reporters.

I have gone over the transcript prepared in the above captioned matter by Phyllis Peterson for the appeal pending before the U. S. Court of Appeals. Miss Peterson's transcript averages about 100-125 words per page and indentations begin halfway across the page. The type is expanded and larger than average type.

In transcripts prepared by me and by my employees, we try to include at least 200 words per page and indent only five spaces from the left margin. Type is regulation pica size and not expanded.

In using the format that Miss Peterson uses in preparation of a reporter's transcript, the cost of the transcript would be almost doubled in my opinion."

adopted by the Judicial Conference of the United States, at its April 5-6, 1973, meeting, provides, under Canon 3:

> "A judge should be patient, dignified, and courteous to . . . lawyers. . . .
>
> A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law. . . .
>
> A judge . . . should not approve compensation of appointees beyond the fair value of services rendered."

Here the judge not only compelled action before he allowed counsel to be heard, but he publicly humiliated counsel by requiring his reporter to see whether counsel's check was good.

Moreover, although the judge thereafter allowed counsel to "show cause," as he had ordered counsel to do, he paid no attention to the cause shown. The "hearing" was a hearing in name only. Yet counsel clearly presented a prima facie case in support of his position. A mere glance at the transcript shows this. That is why, in quoting the transcript in this opinion, we have done so line for line.

The judge referred to a rule of court as prescribing the method of writing the transcript used by his reporter. We have examined the Rules of the United States District Court for the Central District of California, the Federal Rules of Civil Procedure and the Federal Rules of Appellate Procedure, and we find no such rule.

The judge told counsel that "It is done exactly the way it is done in all the other Federal Courts in this district." We have examined the reporters' transcripts in each of the fifteen appeals from the Central District in which reporters' transcripts have been most recently filed in this court. In only one of them was the transcript prepared in the manner used by the reporter in these appeals. That transcript was prepared by the judge's reporter. In every other case, the transcript is in the form recommended in the O'Brien affidavit. A list of the cases with the names of the trial judges and the reporters is set out in the margin.[11]

---

[11]The transcripts were examined in these cases:

(1) Weber v. Teledyne, Inc., 73-1970 (Judge Lucas) (Don Mehler, reporter)

*(2) Sherman v. Dullums, 73-1971 (Judge Hauk) (Phyllis Peterson,

---

*This is the only case in which the transcript is in the same form as the transcript in the case before us.

reporter)

(3) United States v. Gamez, 73-1981 (Judge Kelleher) (Edward Newlander, reporter)

(4) United States v. Crawford, 73-1984 (Judge Kelleher) (Edward Newlander, reporter)

In this case, when the judge sent his reporter out to see whether counsel's check was good, another reporter took over. Her portion of the transcript conforms to the O'Brien recommendation.

 If counsel's prima facie case is as good as it appears to be, transcripts prepared by the judge's reporter in the fashion that she uses must have cost litigants or their counsel, and the government in *in forma pauperis* appeals, very large amounts that should not have been paid. Instead of summarily rejecting counsel's showing, the judge should have looked into the matter to determine whether there had been improper manipulation by the reporter.[12] The payments made, under threat of arrest and punishment, were involuntary and improperly compelled.

It is because of what happened on March 5 that counsel, unwilling to face similar treatment, did not appear on March 19 in response to the judge's certificate correcting the transcript. We cannot blame them.

The judgments appealed from are reversed. In Nos. 72-3185 and 72-3186, the cases are remanded with directions to enter an order granting the motions of defendants Eischen and Morgan to suppress, and for such further proceedings as may be appro-

---

(5) United States v. Reckel, 73-2028 (Judge Williams) (Agnar Wahlberg, reporter)

(6) United States v. Perez, 73-2007 (Judge Lucas) (Don Mehler, reporter)

(7) Rex Chainbelt, Inc. v. Harco Products, Inc., 73-2059 (Judge Hill) (Don Cram—Jack Ellis, reporters)

(8) United States v. Lotito, 73-2116 (Judge Crary) (Virginia Wright, reporter)

(9) United States v. Mohr, 73-2118 (Judge Ferguson) (Marc Yohanna, reporter)

(10) United States v. Pachecho-Amaral, 73-2129 (Judge Kelleher) (Edward Newlander, reporter)

(11) United States v. Di Zerega, 73-2179 (Judge Williams) (Agnar Wahlberg, reporter)

(12) Stockton v. United States, 73-2190 (Judge Pregerson) (Samuel Goldstein, reporter)

(13) United States v. Sedillo, 73-2215 (Judge Lucas) (Don Mehler, reporter)

(14) Blumenthal v. King, 73-2223 (Judge Gray) (Stuart Kane, reporter)

(15) Janis v. United States, 73-2226 (Judge Lucas) (Don Mehler, reporter)

[12] Fees that reporters in the United States District Courts may charge for transcripts ordered by the parties, including the United States, are prescribed by the Judicial Conference, pursuant to 28 U.S.C. and 753 (f). At its September 19-20, 1968 session, the Conference fixed the fees at $1.00 per page for the original and $0.40 per page for each copy. (Report of the Proceedings of the Judicial Conference of the United States, September 19-20, 1968, p. 58.)

priate. In No. 72-3195, the case is remanded for a new trial. Because of the unfortunate contretemps over the reporter's bill, all further proceedings in these cases shall be transferred to another judge, to be designated by the Chief Judge of the United States District Court for the Central District of California.

## SUPPLEMENTAL OPINION ON
## PETITION FOR REHEARING

The United States has petitioned for a rehearing, solely in relation to the appeal of Marshall, No. 72-3195, and as to that appeal, only in regard to subdivision b. of the portion of our opinion that deals with that appeal. We there held that we were unable to determine whether a certain instruction to the jury was correctly reported by the court reporter. The trial judge has submitted a second certificate, to which is attached a photocopy of the pertinent part of the reporter's stenotype notes. This is verified by the reporter in a separate affidavit. At the judge's request, we have had these notes examined by an experienced court reporter for the United States District Court for the Northern District of California. In an affidavit, he states that he has examined the notes, that they bear internal indicia of being original notes, made during the trial, not altered notes produced at some later time, and that they show that the questioned instruction, as given by the judge, was:

> "Now, the law does not compel a defendant in a criminal case to take the witness stand and testify[,] and no presumption of guilt may be raised, and no inference of any kind may be drawn[,] from the failure of a defendant to testify."

Although invited by us to do so, counsel for Marshall has not responded to the petition for a rehearing.

We now find that the judge gave a correct instruction, and that in this respect there was no error. Marshall, however, is still entitled to a new trial on the other ground stated in our opinion.

The petition for a rehearing is denied.