**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter Eugene IRION, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Evan LYON, Defendant-Appellant.**

Nos. 72-2595, 72-2596.

United States Court of Appeals,
Ninth Circuit.

July 26, 1973.

Certiorari Denied Nov. 12, 1973.
See 94 S.Ct. 454.

---

8. The court had immediately before this passage discussed Mills v. Electric Auto-Lite.

Charles M. Sevilla (argued), Federal Public Defender, San Diego, Cal., for defendants-appellants.

Jeffrey F. Arbetman, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., Stephen G. Nelson, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before BROWNING and CARTER, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Appellants were convicted in a nonjury trial of importation of a controlled substance (100 pounds of marihuana) in violation of 21 U.S.C. §§ 952, 960 and 963, and of possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Appellant Irion contends that (1) evidence was illegally obtained through a warrantless search of his motel room; (2) his statement was taken in violation of Miranda v. Arizona; and (3) the evidence was insufficient to sustain his conviction. Appellant Lyon contends that (1) the court erred in denying him standing to object to the evidence seized in Irion's motel room and in failing to suppress; and (2) the evidence was insufficient to sustain his conviction.

### Statement of Facts

Appellants, with Peter Lesser and Robert Ralston, Jr., who were also indicted but not apprehended, sailed a 38-foot sailboat, the Storm Petrel, into Oceanside, California, from Mexico without clearing Customs at San Diego.

About 8:00 P.M. on November 29, 1971 Lesser and Ralston inquired of Officer David M. Wanner of the Oceanside Harbor Police about mooring the boat, then located in the harbor's haulout dock, which is not generally accessible and not for the use of transient vessels like the Storm Petrel. Wanner assigned a mooring slip directly in front of the Harbor Headquarters building. Shortly thereafter Lesser requested change for a telephone call. Wanner asked why the boat had not been moved to the assigned slip, and Lesser replied that one of the occupants had gone somewhere and had not yet returned.

Suspicious, Wanner proceeded to the fuel dock and began surveillance of the Storm Petrel and its occupants. The vessel was located in a darkened area about 100 to 150 yards from Wanner's point of observation. Wanner observed a vehicle, later identified as a Ford Pinto, arrive near the Storm Petrel. An occupant of the Pinto, carrying a small package, went down the rampway where the vessel was located. A few minutes later three persons carried large parcels about the size of duffel bags from the vessel and placed them in the Pinto. The Pinto left the mooring area, and

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

Wanner's attempt to follow it was unsuccessful.

Later that evening, Wanner returned to the Storm Petrel and observed Ralston, Lesser and Lyon aboard the boat eating chicken. Wanner then became aware for the first time that, when the parcels were placed in the Pinto, there may have been four persons (including the driver of the Pinto) in the area of the Storm Petrel.

About 10:30 P.M. in a conversation at the patrol office, Ralston told Wanner that they had come directly to Oceanside from Mexico without reporting to Customs at San Diego. Wanner phoned this information to customs officials and requested assistance. About 11:30 P.M. three customs agents arrived at the harbor.

At about 3:30 A.M., Customs Agent Gore had a conversation with Ralston, Lesser and Lyon, all of whom denied that they knew anything about parcels being removed from the Storm Petrel and placed in an automobile. They proceeded to the Harbor Police Office, where Lesser stated that Irion had, during their journey, departed from the boat at Cabo San Lucas in Mexico.

Also about 3:30 A.M., Officer Bezenah of the Oceanside Harbor Police reported observation of a blue Ford Pinto in the parking lot of the Travelodge Motel in Oceanside. A check revealed that Irion was registered in Room 11 and that the Ford Pinto (a rent-a-car) had been rented by him the prior evening. On the basis of this information, Agent Gore, accompanied by two other officers, proceeded at about 3:35 A.M. to the room registered to Irion and knocked loudly on the door. The officers did not have a search warrant.

After five knocks, the "do not disturb" latch was lifted. Gore announced himself as a customs agent. Irion opened the door about 18 inches. Gore displayed his credentials, again announced who he was, and informed Irion that he desired to talk to him. Irion said either: "Come in, but let me get my pants on first", or "Come in, but I'd like to put on my pants."[1]

Upon entering the room the officers observed three duffel-type bags leaning on the wall directly in front of them. After Irion returned from the bathroom, Gore asked Irion if he had anything to declare to Customs. Irion replied, "Nothing of any value." Gore then asked Irion if they could see the items removed from the Storm Petrel earlier that evening. Irion pointed to the bags and said, "There they are."

Gore asked Irion to open the bags. Irion attempted to open one bag, but, as it was sealed tightly with masking tape, he requested a knife. Understandably hesitant to give Irion a knife, Gore went to a nightstand, picked up a knife belonging to Irion, and opened the bag. Upon examination of the contents, a brick of marihuana was found. The other two bags also contained marihuana, along with sleeping bags, blankets and some books on navigation. In all, the duffel bags contained about 100 pounds of marihuana. Thereupon Irion was placed under arrest and advised of his constitutional rights.

Later that morning Gore arrested Lyon near the harbor area and advised him of his rights. Lyon later stated to Gore that he "had no money in the weed, that Irion was nothing but a drunkard anyway, or alcoholic, and refused to make any comment as to where the weed

---

1. There was a suppression hearing at which Gore testified that Irion's response was, "Come in, but let me get my pants on first. I'm in the nude." No witnesses were called at the trial. The parties stipulated that the police report be received in evidence and that if the officers were called to testify, they "would testify exactly as they have testified in the report of the customs officers." The report on Gore's conversation with Irion reads in part: "Irion * * * replied, 'Come in, but I'd like to put on my pants' (as he was in the nude). He further requested that he be allowed to go to the bathroom, which he was."

was purchased or where the other individuals could have gone."

### Warrantless Search of Irion's Motel Room

Irion first contends that the district court erred in denying his motion to suppress the evidence obtained through the warrantless search and in holding that he consented to the search of his motel room. Relying upon the holding of this court in Bustamonte v. Schneckloth, 448 F.2d 699 (9th Cir. 1971) and related cases [2] he argued primarily that "where, as here, there is no evidence that the appellant knew, or was informed by the officer, that he had a right to withhold permission for the search of the dwelling, effective consent cannot be found."

Certiorari having been granted in Bustamonte v. Schneckloth when this case was argued on January 8, 1973, an order was entered vacating submission pending the decision by the Supreme Court in *Bustamonte.*

Schneckloth v. Bustamonte was decided May 29, 1973, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. In reversing the prior holdings of this court upon which Irion relied the Court held that knowledge of the right to refuse consent is but one of a number of factors to be considered in determining whether a consent is given voluntarily. The Court recognized that when the subject of a search is not in custody and the prosecution attempts to justify the search on the basis of his consent,[3] the Fourth Amendment requires that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* at 248, 93 S.Ct. at 2059.

Irion contends further that he conditioned his consent to entry upon his first putting on his pants and that this condition was ignored by the agents, "who slithered through the eighteen inch door". Both the court and Government counsel questioned the accuracy of a similar statement by Irion's counsel at the oral argument:

"THE COURT: He said, 'Come in, but I would like to put my pants on.'

"MR. ARBETMAN: And the testimony was that he was allowed to do so.

"THE COURT: The door was opened far enough so that they could pass through without squeezing their way in and then they noticed 3 duffel bags."

There was substantial evidence to support the conclusion of the district court that Irion did not condition his consent to entry on his *first* putting on his pants and that, in any event, the agent granted his request to put on his pants.[4]

2. See Cipres v. United States, 343 F.2d 95, 97 (9 Cir. 1965), and Schoepflin v. United States, 391 F.2d 390, 398–399 (9 Cir. 1968), cert. denied, 393 U.S. 865, 89 S.Ct. 146, 21 L.Ed.2d 133 (1968).

3. The Court noted that, "In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." *Bustamonte, supra* 412 U.S. at 227, 93 S.Ct. at 2048.

4. Gore was examined and cross-examined at length at the suppression hearing regarding the conversation when the agents entered Irion's motel room. On cross-examination he testified in part:

"Q. And what was the conversation, again?

"A. I identified myself to him. He said, 'Yes.' I said, 'I would like to talk to you,' and I had my credentials in my hand. He said, 'Just a moment. Can I get my pants on? I'm in the nude.' I said, 'Yes.' So, we stepped in. He then asked, 'May I go to the bathroom?' I said, 'Go ahead.'

\*     \*     \*     \*     \*

"Q. When he said, 'Let me get my pants on first,' doesn't that indicate to you that he wanted you to stay out until he at least got his pants on?

"A. No, sir."

■ It is true, as appellants argue, that when, as here, consent is obtained "under color of the badge", coercion is implied and "the government must show that there was no coercion in fact." United States v. Page, 302 F.2d 81, 84 (9 Cir. 1962). We recognized in *Page,* however, that appellate courts usually sustain a trial court's finding that there was consent to a search, even though the consent was obtained under authority of the badge,[5] particularly where there is a finding of express consent. *Id.* at 84 and cases cited in footnote 10. Here the district court found that the agents were permitted to enter the motel room "freely and voluntarily" and that Irion consented to the entry and the search of the duffel bags.[6]

■ Considering the totality of the surrounding circumstances, we conclude, as did the district court, that Irion's consent was in fact voluntarily given and not the result of duress or coercion, express or implied.[7]

### Was Miranda Warning Required?

Irion argues that the statement he made to the customs agents after their entry into the motel and observation of the duffel bags was inadmissible as "custodial interrogation" within the meaning of Miranda v. Arizona, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As noted *supra* (Note 1) the parties stipulated for the receipt in evidence of the police report containing the testimony of Agent Gore. No objection was interposed to any part of his testimony, although subsequently in oral argument counsel suggested that *Miranda* would be applicable.[8]

"Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. A number of tests have been applied in determining whether a person has been deprived of his freedom of action in any significant way.[9] This court in Lowe v. United States, 407 F.2d 1391 (9 Cir. 1969), adopted the "reasonable man" test for determining whether a person is "in custody", i. e., whether a person, as a reasonable man, believes that his freedom is significantly impaired. "It is the officer's statements and acts, the surrounding circumstances, gauged by a 'reasonable man' test, which are determinative." *Id.* at 1397.

In a careful analysis of the Court's language in *Miranda* and the application of the reasonable man test Judge Friendly pointed out that where, as here, there is no actual arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." United States v. Hall, 421 F.2d 540, 545

---

5. In *Page* the district court had not exercised its "fact-finding functions; rather it, in effect, sustained a 'demurrer to the evidence'." We remanded for a determination by the district court whether or not consent had in fact been given. ,

6. This is clear from the trial judge's comments in open court following oral argument and before finding appellants guilty. The parties had waived special findings of fact. It may be noted also that Gore was examined at length at the suppression hearing and the district court had the benefit of this testimony, as well as the police report, in finding that consent was given.

7. In view of this holding it is unnecessary to determine whether the search could be

---

upheld as a border search, as is alternatively argued by the Government.

8. The trial was held on April 13, 1972. No objections were made by any of the parties to any portion of the police report. The parties were given an opportunity to file briefs and present oral argument at a later date. At oral argument on June 5, 1972 counsel for Irion suggested the application of the *Miranda* rule by reason of the "interrogative atmosphere in his own house, 3:30 in the morning".

9. See Kamisar, Criminal Law and the Constitution—Sources and Commentaries, and particularly Chapter 4 dealing with "Custodial Interrogation Within the Meaning of *Miranda*," listing at page 362 four alternative tests.

(2 Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970).

We conclude that the brief and non-coercive questioning of Irion at the time of the entry and search and prior to his arrest did not constitute "in custody" interrogation.

### Sufficiency of Evidence

Irion's final contention, in which he is joined by Lyon, is that the evidence was insufficient to sustain the convictions in that there was no competent evidence that the substance seized in Irion's motel room was in fact marihuana.

It is true that the substance itself was not introduced into evidence at trial. This, however, is not fatal to the Government's case, since "It is axiomatic that the nature * * * of physical objects may be proved by parol evidence and production of the objects themselves is merely cumulative." Francis v. United States, 239 F.2d 560, 562 (10 Cir. 1956).

The "police report",[10] the only evidence at the trial, contains the following references to marihuana:

The report recites at the outset that it involves "the seizure of approximately 100 lbs. of marihuana" and under the title "Seizures" there is included "A. Approximately 100 lbs. of marihuana."

Under "Disposition of Seizure" it is recited that Special Agent Gore delivered the marihuana to the Seizure Clerk and that samples had been submitted to the United States Customs Chemist for analysis.

Included as part of the testimony of Agent Gore with reference to finding "a brick-type package inside" the duffel bag, there appears: "After close examination, it was determined that it contained marihuana."[11]

In listing the witnesses, it was recited that, "Customs Chemist, San Diego, California will testify as to the chemical analysis of the substance sent by the Seizure Clerk * * *."

It is unfortunate that the report did not specify what the chemist would testify, but presumably when it was prepared it was assumed the chemist would be called as a witness. In any event, there is positive testimony from Customs Agent Gore that the substance was marihuana, and his competency to so testify was not challenged at the trial. In oral argument (approximately two months after the trial) all counsel relied on the stipulation and evidence at the suppression hearing, and there was no suggestion of any question regarding the nature of the substance.

This issue was first raised on appeal. Had it been raised at the trial or oral argument, the Government would no doubt have been permitted to reopen its case and call the chemist as a witness or introduce his written report in evidence.

Under these circumstances, and in view of Gore's unchallenged and uncontradicted testimony that the substance was in fact marihuana, this untimely challenge by both appellants to the sufficiency of the evidence must fail.

### Was Evidence of Lyon's Participation Sufficient to Sustain his Conviction?

It is true, as appellant Lyon contends, that the mere fact that a person is a passenger on a sailboat from which mar-

10. The police report was in fact presented to the court by counsel for Irion, with this statement: "Mr. Arbetman of the government, and Mr. Politis (counsel for Lyon) and I have entered into a stipulation to the police report in this case, that if the officers named in the police report were called today to testify, they would testify exactly as they have testified in the report of the customs officers."

11. At the suppression hearing Gore testified on direct examination, "Inside the first package I opened up there was a brick-shaped object, which upon closer examination revealed to be marihuana," and "The other two also contained marihuana along with sleeping bags, blankets, and some navigation books." On cross-examination he was asked by counsel for Irion, "How much marihuana was found in the bags?", to which he replied, "Approximately a hundred pounds."

ihuana is removed does not make him criminally responsible for possession or importation of the marihuana. There must be a "basis for a rational attribution that he had some interest in the marihuana itself, or if he was without any such interest, that he was participating in its importation by some proximate action to effect that end, such that his status * * * was that of an aider and abettor." Bettis v. United States, 408 F.2d 563, 568 (9 Cir. 1969).[12]

Moreover, "mere knowledge of the crime, or mere presence at the scene of it, is not sufficient evidence to convict a defendant of knowingly participating in a crime." United States v. Samaniego, 437 F.2d 1244, 1246 (9 Cir. 1971).

It is undisputed that Lyon was one of four persons on a sailboat, the Storm Petrel, which departed from Guadalupe Island, Mexico, and arrived five days later at Oceanside, California, without stopping at a United States port of entry. The Storm Petrel was registered to Irion. Both Irion and Lyon were residents of Eureka, California, and each had a Mexican Tourist Permit for Magalan, Sinalon, Mexico, dated October 14, 1971. There is substantial evidence that 100 pounds of marihuana were transported in the boat, taken off at Oceanside, and removed by car to Irion's motel room, where the contraband was seized by customs agents.

To determine the extent of Lyon's alleged participation in the possession and importation of the marihuana, it is necessary to refer in some detail to the specific references to Lyon in the "Police Report" of the Bureau of Customs.[13]

The first specific reference to Lyon appears in the "testimony" of David Wanner, Oceanside Harbor Patrol, when Wanner went to the boat after his unsuccessful attempt to follow the Ford Pinto:[14]

"He then returned to the Harbor Headquarters building area, but before returning to the office, advised the subjects in the vessel that they would have to move their vessel to the assigned berthing area. At this time, it was noted that there were three subjects aboard the vessel.

"Upon engaging in conversation with the third subject, later identified as James Evan LYON, it was learned that they were eating fried chicken and would move their vessel very shortly."[15]

The "testimony" of Agent Gore contains the following specific references to Lyon:

(Conversation with Lesser, Ralston & Lyon about 3:30 A.M.)

12. See also United States v. Thomas, 453 F.2d 141, 143 (9 Cir. 1971), cert. denied, 405 U.S. 1069, 92 S.Ct. 1516, 31 L.Ed. 2d 801 (1972), and cases there cited. These cases involved presence as a passenger in an automobile transporting contraband across the border.

13. The determination of whether the evidence was sufficient to sustain a finding of guilt by the trial court is complicated by the manner in which the case was tried—through submission of the police report by stipulation rather than an adversary proceeding with both sides having an opportunity to clarify conclusory testimony. Wanner and Gore did testify at the hearing on Irion's motion to suppress. Lyon had not joined in the motion to suppress. His counsel was present, but did not participate in the hearing. It was agreed, however, at the trial that a transcript of the testimony should be obtained and considered by the court. All counsel referred to the evidence at the suppression hearing, but it was of course concerned with the validity of the search rather than Lyon's guilt.

14. This was between 9:20 P.M. when Wanner first observed the vehicle and 9:50 P.M. when he returned to the Patrol Office. Wanner testified at the suppression hearing that he observed a vehicle pull up adjacent to where the vessel was parked and a person "exited from the passenger side of the vehicle carrying some sort of a package" and went down a rampway where the vessel was moored. Shortly thereafter three persons were observed carrying large parcels of duffel-bag size to the vehicle.

15. Wanner testified at the suppression hearing that he found three subjects eating at that time and one of them stated they were eating Kentucky Chicken. He observed a bucket size barrel of chicken.

"Gore then asked what articles had been removed from the vessel earlier that evening and placed in a vehicle, at which time LESSER and the individuals later identified as RALSTON and LYON replied, 'What vehicle are you talking about? Nothing has been taken off the boat, and we don't even have a car.' " [16]

\*   \*   \*   \*   \*   \*

"At 5:10 a. m., 11/30/71, Gore placed LYON under arrest and advised him of his constitutional rights." [17]

\*   \*   \*   \*   \*   \*

"At 9:22 a. m., Agent Gore re-advised LYON of his constitutional rights. LYON stated that he had no money in the weed, that IRION was nothing but a drunkard anyway, or alcoholic, and refused to make any comment as to where the weed was purchased or where the other individuals could have gone."

■ The trial court could reasonably infer from the evidence that Lyon knew that the vessel was transporting marihuana. He did not at any time in his conversations with the officers deny knowledge of the marihuana. Rather his statement that he "didn't have any money in the weed" was a tacit admission he knew contraband was on the vessel.

It is true, as Lyon contends, that Wanner was unable to identify the three persons who carried the duffel bags from the boat and placed them in the Ford Pinto. The court could reasonably infer, however, whether or not Lyon was one of those persons, that he knew someone from the Ford Pinto had come aboard and that the duffel bags were removed from the boat. Within a few minutes after Wanner observed the transfer of the duffel bags he was aboard the vessel talking with its occupants. It was Lyon who then told Wanner they were eating fried chicken [18] and "would move their vessel very shortly". Lyon participated in the later conversation with the officers when the three occupants remaining on the boat (Lyon, Lesser and Ralston) denied that any parcels had been taken off the boat and claimed that Irion had left the boat in Mexico.

This is not a case where the defendant was a passenger for a short period of time in a vehicle crossing the border. It was an extended trip by four persons in a sailboat, culminating in the five-day trip from Mexico to Oceanside, California.[19] Nor is it a case where the accused was simply present when the offense was committed or a mere listener when others made incriminating statements. He actively participated in the conversations with the officers and joined in exculpatory statements which were obviously false.

■ As we noted in *Bettis, supra,* 408 F.2d at 568, proof of the requisite relationship to the contraband such that

---

16. At the suppression hearing Gore testified in part: "The three individuals jointly or unanimously said, 'What packages are you talking about? We don't know anything about that. We don't even have a car.' And I explained to them that one of the officers from the Harbor Police had observed what he thought was packages coming from the vessel and placed in the car, and they said, 'We don't know anything about that. We don't know what the officer has seen.' "

It appears under "History of Case" in the report, signed by Gore, that in the same conversation Lesser stated that Irion "had debarked the vessel in Cabo San Lucas, Mexico and they did not know his whereabouts."

17. Under "History of Case", it appears that after Irion was arrested, "Officers then proceeded to the vicinity of the STORM PETREL and arrested LYON, who had been observed proceeding from the vessel. Neither LESSER nor RALSTON could be found."

18. The court could reasonably infer also that the package carried on board contained the Kentucky fried chicken to which Lyon referred.

19. In colloquy with counsel during the oral argument, the trial court noted that Lyon was a passenger "all the way up the coast of Mexico".

the accused "could probatively be found to be more than a passenger" can "sufficiently be made by indication from relationship, attitude, conduct, utterance or other probative circumstances shown." In our opinion this case is closely analogous to the situation in Eason v. United States, 281 F.2d 818 (9th Cir. 1960) where we sustained possession convictions, denying application of the "passenger doctrine" on the ground that the occupants of the vehicle were close friends and had participated together in "joint venture" fashion in a pleasure trip to Mexico. Here the reasonable inference that Lyon knew there was contraband on the Storm Petrel and the joint venture participation in the lengthy sailboat cruise were sufficient to establish that Lyon was "more than a passenger" and had the required relationship to the contraband sufficient to sustain his convictions for possession and importation.

It is true that the evidence against Lyon is largely circumstantial, but as this court has recognized in many cases it is proper "to infer a fact at issue from other facts which have been established by circumstantial evidence" and "circumstantial evidence is not inherently less probative than direct evidence." United States v. Nelson, 419 F.2d 1237, 1239 (9 Cir. 1969). As to both direct and circumstantial evidence, "the jury must use its experience with people and events in weighing the probabilities." *Id.* at 1244, quoting from Holland v. United States, 348 U.S. 121, 140, 75 S. Ct. 127, 99 L.Ed. 150 (1954). In determining whether a motion for acquittal should have been granted, "the reviewing court may properly inquire whether the evidence, considered most favorably to the government, was such as to permit a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt" (*Id.* at 1242), and the test of reasonable doubt is whether the "jurors reasonably could decide that

they would not hesitate to act in their own serious affairs upon factual assumptions as probable as" that the defendant participated in the criminal offense. *Id.* at 1245.[20]

Viewing the evidence as a whole in the light most favorable to the Government, we conclude that the evidence and reasonable inferences to be drawn therefrom were sufficient to sustain the trial court's finding of guilt on the grounds that the "passenger doctrine" was not applicable and that Lyon was participating in a joint venture with the other occupants of the boat.

Affirmed as to both appellants.

---

20. Here a jury was waived and Lyon was found guilty by an experienced trial judge who was familiar with the tests to be applied in determining whether the defendant was guilty beyond a reasonable doubt.