UNITED STATES of America, Plaintiff-Appellee,

v.

James G. RYAN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Adrian WILSON, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Bernard ZELDIN, Defendant-Appellant.

Nos. 75–1317, 75–1314 and 75–1313.

United States Court of Appeals, Ninth Circuit.

May 24, 1976.

Rehearing Denied in No. 75–1313 June 28, 1976.

Certiorari Denied Nov. 8, 1976.

As Amended Nov. 30, 1976.

See 97 S.Ct. 354.

**784**

Godfrey Isaac (argued), Beverly Hills, Cal., for defendant-appellant in No. 75–1313.

John C. Bartlett (argued), Reno, Nev., for defendant-appellant in No. 75–1314.

Harry E. Claiborne (argued), Las Vagas, Nev., for defendant-appellant in No. 75–1317.

Lawrence Semenza, U. S. Atty. (argued), Reno, Nev., and Richard A. Wright, Asst. U. S. Atty. (argued), Las Vegas, Nev., for plaintiff-appellee.

Before WRIGHT, KILKENNY and TRASK, Circuit Judges.

TRASK, Circuit Judge:

Adrian Wilson, Bernard Zeldin and James Ryan appeal their convictions in Federal District Court for the District of Nevada for violation of 18 U.S.C. § 1952, the so-called "Travel Act," 18 U.S.C. § 371, the federal conspiracy statute, and 18 U.S.C. § 2, the aiding and abetting statute. They make several assignments of error, relating to the jurisdiction of the court below, the legality of evidence gathered by wiretapping and electronic surveillance and the general conduct of the government in investigating and prosecuting this case. In connection with this last issue, appellants Zeldin and Wilson also argue that the government intentionally interfered with their attorney-client privilege. In addition, appellant Ryan alleges that the evidence was insufficient to support the verdict against him as a coconspirator, appellant Wilson argues that the trial judge erred in refusing certain jury instructions, and appellants Zeldin and Ryan challenge the constitutionality of the Travel Act. For the reasons set forth below, we affirm all appellants' convictions.

Each of the appellants filed an opening brief emphasizing facts as they apply to his particular case. · Mindful of these individual variations we review the facts in their entirety, considering them in the light most favorable to the government, which is the appropriate standard for appellate review of judgments of conviction. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Munns,* 457 F.2d 271 (9th Cir. 1971).

The case revolves around the attempt of appellant Wilson, a well-known architect and resident of Los Angeles, to have certain land he owned in Nevada approved for rezoning and acts of bribery committed to achieve this purpose. The rezoning decision was to be made by the Clark County Board of Commissioners. The central figure in this episode was one Miro Mizera, an unindicted coconspirator, a Czechoslovakian refugee in ill health and a licensed realtor in the Las Vegas area.

Mizera was interested in helping Wilson subdivide and sell his property. He visited Wilson in January 1972 in Los Angeles and told Wilson that rezoning could be accomplished only if a political contribution to the county commissioners were made. Mizera agreed to talk with Commissioner Ryan about this matter.

Mizera thereafter held a series of meetings with Ryan. At the first meeting, Ryan told Mizera that prospects for approval of the application were favorable. No discussion of a bribe or campaign contribution was made until the second meeting, when Mizera mentioned a $10,000 political contribution. After the Planning Commission, an advisory body, recommended rejecting the rezoning plan, Ryan told Mizera that he (Mizera) would have to approach the other four commissioners himself.

Mizera was given an unenthusiastic reception by Commissioners Leavitt, Brennan, Wiesner and Broadbent, although all of them at least indicated to Mizera that the prospects for eventual approval of the plan were good. After meeting with Mizera on April 24, 1972, Broadbent telephoned the state Attorney General and informed him that he thought Mizera had offered a bribe in exchange for his vote. Broadbent then agreed to cooperate with state authorities by "playing along" with Mizera and recording all conversations with him.

The following day, the Board of Commissioners voted to continue consideration of the application until May, when Wilson could more conveniently be in Nevada. Shortly thereafter, Mizera contacted a Las Vegas attorney, Morris, to inquire about the possibility of representing Wilson at the hearing. Exactly what terms were discussed between Morris and Mizera is subject to dispute, but it appears that Morris was informed of the bribery scheme. In any event, a retainer agreement between Morris and Wilson was consummated. Mizera then told Broadbent that Morris would be representing Wilson in the forthcoming commission meeting and detailed the scheme as it then stood. This conversation was recorded.

On April 27, Broadbent, acting through an intermediary, Reeves, told Morris that he was being led into a trap and that he should get out of the affair altogether. Morris then withdrew from the retainer agreement, returning the fee Wilson had paid him. This contact between Broadbent, who was serving as a government informer, and Morris gives rise to one of the issues on appeal.

Mizera continued to meet with Broadbent and Ryan in May. His purpose at this time was to have one of them take control of the bribery plot and work to ensure the votes of the other commissioners. In particular, Mizera wanted one of them to make the motion for rezoning at the meeting. On May 16, 1972, Broadbent, at the behest of state agents, told Mizera that he had to back out of the deal and would not be able to support the zoning application. There was no further contact between Mizera and Broadbent until after the Commission meeting.

Mizera was also in contact with appellant Zeldin during this time. Zeldin was a local businessman who was to take charge of the development of Wilson's land after approval of the rezoning plan. Zeldin went to Los Angeles to confer with Wilson concerning the bribery scheme and to obtain the bribery money which Wilson had borrowed from a Los Angeles bank. This interstate trip formed part of the basis for the indictment under 18 U.S.C. § 1952, the Travel Act.

After Broadbent withdrew from the plot, Mizera telephoned Zeldin, who was in Los Angeles, and the two discussed the problem of which commissioner would make the motion for approval of the application. This interstate conversation also formed part of the section 1952 indictment. The following day, May 17, 1972, Mizera met with Ryan and at this time Ryan said that he would make the motion. Thereafter, Mizera again telephoned Zeldin in Los Angeles.

On May 19, 1972, Mizera was approached by state agents and informed of the evidence they had amassed against him through his conversations with Broadbent.

The state agents offered Mizera immunity from prosecution in return for his assistance. From that point forward, Mizera was a state agent whose conversations were recorded. The tactics of the government in obtaining Mizera's cooperation give rise to another important issue in this appeal.

The bribery scheme was discussed and recorded in a conversation between Ryan and Mizera that very evening. Mizera also met with Wilson, who had flown in from Los Angeles on May 21 for the commissioners' meeting the following day, at which time the distribution of the bribery money among the commissioners was discussed. This conversation was also recorded.

The commissioners met on May 22. Commissioner Ryan made the motion, and the zoning application was approved. Mizera, Wilson and Zeldin then caucused in a motel room and Mizera was given the money to distribute to the commissioners. State agents monitored this entire meeting through a transmitting device Mizera carried on his person. The following day, Mizera went to Ryan's home and gave him the bribery money, which Ryan accepted. Immediately thereafter, state agents, who had been hiding in the trunk of Mizera's car, arrested Ryan.

## I.

■ The first count of the indictment charged all appellants with conspiring to violate the Travel Act, 18 U.S.C. § 1952,[1] the second with violating the Travel Act and aiding and abetting therein, pursuant to 18 U.S.C. § 2.[2] In a case where jurisdiction depends upon the interstate nature of the criminal activity, as with section 1952, section 2 considerably eases the prosecutor's burden. Because of section 2, he does not have to show the interstate nature of each defendant's activity, but rather that the scheme as a whole had substantial interstate connections. If it did, he must then prove that each defendant aided or abetted the scheme to make out his violation of section 1952 against each defendant. It is for this reason that, in deciding the jurisdictional question, our primary focus is upon the scheme as a whole.

■ Appellants urge that the offenses committed here were matters of local concern; that there was no connection between the interstate travel and usage of interstate facilities and what they characterize as an "isolated local offense." Appellants argue that *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), is dispositive of the question of jurisdiction and mandates a finding that the acts committed in this case do not come within the ambit of section 1952. In that case, petitioners conducted an illegal lottery in Florida, just south of the Georgia-Florida state line. Although there was no evidence that petitioners themselves crossed state lines in connec-

1. 18 U.S.C. § 1952 states:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
"(1) distribute the proceeds of any unlawful activity; or
"(2) commit any crime of violence to further any unlawful activity; or
"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal

excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
"(c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury."

2. 18 U.S.C. § 2 states:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

tion with the lottery, several of the patrons of the lottery did so. On these facts, the Court held section 1952 inapplicable.

We do not find that *Rewis* supports appellants' position. We note specifically that the Court in *Rewis* cited with approval three lower court cases in which the organizers of an illegal scheme either traveled in interstate commerce or caused other organizers—as opposed to patrons—to do so.[3] These cases, Justice Marshall said, "correctly applied § 1952 to those individuals whose agents or employees cross state lines in furtherance of illegal activity." 401 U.S. at 813, 91 S.Ct. at 1060. We find the facts of these cases, all involving illegal gambling operations, much closer to our case than those of *Rewis*, since we are confronted with no parties comparable to the patrons of *Rewis*.

This court reads the statute as broadly as *Rewis* will permit. In *United States v. Roselli*, 432 F.2d 879, 890–91 (9th Cir. 1970), a pre-*Rewis* case, we took a broad view of the act, rejecting a wide variety of challenges to its applicability which would have narrowed the act considerably. This broad construction was cited with approval in *United States v. Colacurcio*, 499 F.2d 1401, 1405–06 (9th Cir. 1974), a case decided well after *Rewis*.

Applying this general framework to appellants' case, we have no difficulty in concluding that this scheme comes well within the ambit of the statute. Mizera and Zeldin traveled in interstate commerce to discuss the rezoning with Wilson in California. Wilson gave Zeldin $10,000 to transport from California to Nevada. Wilson traveled from California to Nevada to attend the county commissioners' hearing. Zeldin

took part in at least two interstate telephone conversations with Mizera.[4]

## II.

Evidence obtained by electronic surveillance and wiretapping in the investigation of this case can be divided into three types. First, state agents obtained evidence through wiretaps on the phone of Broadbent, the county commissioner who served as a government informant, as well as a "body tap" placed on Broadbent. A court order pursuant to state statute was obtained for the telephone tap but not the body tap. No party disputes that Broadbent's consent was obtained for both forms of electronic surveillance. Second, a wiretap order was issued pursuant to the same Nevada statute on May 4, 1972, permitting state agents to wire Mizera's residence and office, and to tap telephones in those places. Many conversations were recorded under this order between May 5 and May 19, but only those involving Broadbent were offered at trial. Third, on May 19, 1972, Mizera agreed to cooperate with government authorities and also agreed to allow his conversations, both telephone and personal, to be taped.

■■■ As to the first type of wiretap evidence, the law in this circuit is clear that one party's consent is sufficient justification for electronic surveillance and no prior judicial authorization is required. *Holmes v. Burr*, 486 F.2d 55 (9th Cir. 1973). Since no party disputes that Broadbent's consent was freely given, any evidence derived from the wiretap is free from challenge.

■ As to the second type, we note that none of these tapes (except those which also involved Broadbent) were introduced at trial. Pursuant to the command of *Alderman*

**3.** *United States v. Chambers*, 382 F.2d 910 (6th Cir. 1967); *United States v. Barrow*, 363 F.2d 62 (3d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *United States v. Zizzo*, 338 F.2d 577 (7th Cir. 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965).

**4.** Appellants Zeldin and Ryan also argue that the Travel Act is unconstitutional as impermissibly vague or an infringement of the powers

reserved to the states in the Tenth Amendment. Contentions of this nature have been consistently rejected both by this court and other circuits. *United States v. Cozetti*, 441 F.2d 344, 348 (9th Cir. 1971); *United States v. Nichols*, 421 F.2d 570, 574 (8th Cir. 1970); *Turf Center, Inc. v. United States*, 325 F.2d 793, 795–96 (9th Cir. 1963). By contrast, appellants have cited no cases holding the statute unconstitutional and we know of none.

*v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), a hearing after the trial was nonetheless held to determine "the nature and relevance to [their] conviction of any conversations which may have been overheard," *Alderman, supra,* at 186, 89 S.Ct. at 973. At this hearing, the district court ruled that the government had an independent source, Broadbent, for all information obtained by the wiretap on Mizera's phones during the period between May 5 and May 19. The court also ruled that Mizera himself became an independent source of this same evidence after May 19, when he agreed to cooperate with the authorities and told them all that had gone on prior to that time. No appellant was able to demonstrate to the court's satisfaction that evidence used at trial, or leads to evidence used at trial, were discovered as a result of these interceptions. Therefore, the court concluded that aside from the independent sources, "the information or leads obtained [from the Mizera wiretap before May 19] were insignificant and insubstantial." After a thorough review of the evidence presented at this hearing and the arguments of counsel on behalf of their clients, we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We therefore affirm the trial court's conclusions.

Finally, we hold admissible on the basis of one party's consent evidence obtained from taps on Mizera's telephone and person after May 19. *Holmes v. Burr, supra.* The question of Mizera's consent is discussed in more detail in Part III, *infra.*

### III.

Appellants' arguments are also directed at the manner in which the government enlisted Mizera as a government informant. They claim that their due process rights have been violated by the government's treatment of Mizera. They would have us dismiss the indictment altogether on due process grounds, or, at the very least, ex-

clude all evidence procured from the Mizera wiretap after May 19.

Appellants rely particularly on Justice Rehnquist's statement in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction" and argue that this is precisely that type of situation. Appellants' reliance upon this passage from *Russell* has two distinct bases.

*Russell* was directed specifically toward a consideration of the nature of the entrapment defense. Appellants faintly argue that *Mizera* forced them to commit criminal acts they would not otherwise have committed. This, of course, would be entrapment under the *Russell* standard. They argue more strenuously, however, that *Russell* considered entrapment from another perspective—the so-called "objective approach," where the focus is not on the "propensities and predisposition of a specific defendant, but on 'whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.'" *Russell, supra* at 441, 93 S.Ct. at 1647 (Stewart, J., dissenting). While the Court's opinion in *Russell* very clearly excludes use of the "objective approach" in most entrapment cases, the above-quoted passage of Justice Rehnquist for the Court does indicate that this approach may in certain limited instances be appropriate.

In examining the circumstances surrounding the government's confrontation with Mizera, in which he agreed to cooperate with government authorities, and Mizera's activities thereafter, we conclude that, measured against the *Russell* standard, the government's conduct did not rise to the level of a violation of appellants' due process rights. Government agents first read to Mizera the Nevada bribery statute, the "unlawful activity" which served as the predicate for the section 1952 indictment, and

then recited some of the evidence they had amassed against him. Thereafter, it is un-disputed that this "conversation" included the following factors:

1. Repeated assertions to Mizera that he *would* go to jail for 10 years if he refused to cooperate (10 years was the maximum sentence; the statute allows for 1–10 years imprisonment and no defendant was ultimately given the maximum)..

2. Admonitions to Mizera not to get an attorney or his "usefulness" to state agents would be over.

3. Prophecies that his health would suffer irreparably if he went to jail.

4. Assurances that his friends, Wilson and Zeldin, would be kept "out of it."

5. Reminders that if he did not help obtain sufficient evidence against Ryan, he himself would be indicted.

This court does not condone the tactics used to gain Mizera's co-operation. We explicitly disagree with the lower court, which characterized the government's efforts as "excellent professional police work." On the basis of the applicable legal standards derived from *Russell*, however, we find that this treatment of Mizera does not violate appellants' due process rights. This court has emphasized that the due process channel which *Russell* kept open is a most narrow one, to be invoked only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice. *United States v. Lue,* 498 F.2d 531, 534 (9th Cir. 1974). The government's conduct, while not exemplary, does not rise to this level. *See Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

▮ Nor does the government's treatment of Mizera and his acts as a govern-

ment agent constitute entrapment in the "subjective," *Russell* sense. "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play" *Russell* teaches, 411 U.S. at 436, 93 S.Ct. at 1645.[5] Here, the government enlisted Mizera's cooperation when the conspiracy was in a very advanced stage, just prior to its culmination on May 22. The conspiracy had been ongoing since at least January of that year.

Moreover, there is no evidence that Mizera's course of conduct changed in any sense after his enlistment on May 19 or that he influenced any of the appellants to change their course of conduct after he became a government agent. He continued to meet and discuss the bribery plan with Ryan. Wilson had previously made a commitment to come to Las Vegas on May 21, and, as planned, Mizera met with him then, at which time the distribution of the bribery money was discussed. Zeldin was also present at this meeting, as planned. The argument that Mizera emplanted a criminal intent in unwilling participants at this late stage is transparently implausible.

Likewise we are unpersuaded by appellants' argument that Mizera's decision to cooperate was coerced. Whether consent was voluntary or coerced is essentially a question of fact. *United States v. Page,* 302 F.2d 81 (9th Cir. 1962). When presented with the problem, the District Court Judge wrote a 13 page memorandum in which he dealt exclusively with the Mizera question. In resolving that issue as he did, he pointed out that he not only had the testimony of Mizera clearly in mind but that he also had considered the two tape recordings of the meeting between Mizera and the agents when Mizera agreed to cooperate. The trial judge commented on those

5. For this reason we reject Wilson's contention that the trial court's refusal to give entrapment instructions relating to Broadbent's contact with Wilson was reversible error. There is no indication that Wilson posed any objection to the trial court's refusal to give his proposed instructions and normally a failure to object will preclude appellate review. Fed.R.Crim.P.

30; 5A *Moore's Federal Practice* ¶ 51.04. Even if he had posed a timely objection, however, his proposed instructions would have presented to the jury statements of the law based upon an "objective standard" and therefore at odds with *Russell's* clear holding. They were thus properly rejected.

conversations at some length,[6] coming to the conclusion that Mizera voluntarily consented to cooperate.[7]

Requiring a defendant to face up to the real world in order to obtain his cooperation or to obtain admissions of guilt or a plea of guilty is permissible under our system. In *Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747, the Court said:

"The State to some degree encourages pleas of guilty at every important step in the criminal process. For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction."

See also *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854

6. "When representatives of the Nevada Attorney General first approached Mizera on the morning of May 19, 1972, they told Mizera that they were there to ask for his cooperation, outlined their knowledge of his involvement in an ongoing criminal project of bribing County Commissioners, let Mizera read NRS § 197.020 (offering a bribe to a public official is a felony), assured Mizera that offering a 'campaign contribution' which is clearly conditioned upon a favorable vote on a zoning matter falls within that statute, indicated that they were more interested in discovering Commissioners who would accept bribes, stated that they were fully prepared to arrest Mizera at that point and that they had enough evidence to convict him and send him to prison for ten years, but offered Mizera the alternative of cooperation, in which event he could avoid prosecution, the penitentiary, and loss of his real estate broker's license. When Mizera asked if he might call an attorney, state officers responded that, because they feared that an attorney might notify the Commissioners of the investigation, and that because some attorneys might thereby compromise Mizera's position, they did not want him to contact an attorney. They quickly added that they were not saying he could not call an attorney, but were saying only that if he did, any offer of a deal was over. (It might be added parenthetically that testimony at the trial has indicated that intimations of the investigation were in fact given to some of the Commissioners by a local attorney, and that the agents' fears were not totally unfounded.) The agents outlined some of the disadvantages of an arrest and conviction, noting that Mizera would face ten years in prison, that it would have an impact on his family, that he would lose his license and his income derived therefrom, and stated that he would be unable to go back to New York for a specialist's treatment of his headaches. The agents were candid about Mizera's position, stating that, in view of the alternatives, he was not in a position to bargain if he was to receive immunity. Once assured that he would be provided with protection from possible threats to his life because of his cooperation, Mizera agreed to cooperate. Mizera's decision was made in a matter of minutes from the time he was confronted. The *tapes reflect the fact that the agents were direct but not vociferously overbearing.*

". . . Mizera also testified that he was not fearful of a prison term, but he *subjectively* concluded that he would not get the medical care he felt he needed in prison. He stated that the agents never said that medicine would not be provided him if he refused to cooperate. Mizera, under cross-examination, indicated that he clearly understood the agents to say that, while he could call an attorney if he wished, it would mean that no deal would be offered him. While he stated he consented to cooperate with reluctance, Mizera nevertheless testified that he agreed to cooperate and went with the agents voluntarily.

"Finally, although the tape recordings made during the meetings of that day show that Mizera had occasional reluctant afterthoughts about cooperating, the major portions of the recordings reveal Mizera freely volunteering suggestions on how to proceed with the investigation."

7. "Considering the circumstances as a whole, the tone, approach and statements of the agents, the rapidity with which Mizera consented, the active and willing cooperation Mizera demonstrated immediately after agreeing to assist the investigation, and Mizera's own testimony that he cooperated and voluntarily began that cooperation, this Court finds that Mizera's initial consent was 'voluntary' and valid."

(1973); *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

While we would have preferred that the government had shown more restraint after confronting Mizera with the evidence against him, we cannot say that the judgment of the trial court was clearly erroneous. We, therefore, hold that all wiretap and electronic surveillance evidence derived from Mizera's conversations after May 19 was properly admitted on the basis of one party's consent. *Holmes v. Burr*, 486 F.2d 55 (9th Cir. 1973).

Appellants Zeldin and Wilson raise an independent due process argument regarding the contact between Broadbent, who, it will be recalled, was also a government informant, and Morris, Wilson's retained attorney. It is undisputed that Broadbent approached Morris through an intermediary on April 27, 1972, and told Morris that he was being led into a trap, after which Morris withdrew from representing Wilson. Beyond this, however, the circumstances surrounding this contact are shrouded in mystery.

It is not clear, for example, on what basis Zeldin claims his due process rights were violated by Broadbent's contact. Morris testified at trial that he never met Zeldin prior to April 27, 1972. Zeldin claims at one point that he had agreed to enter into a partnership with Wilson, while at another point he states he *was* in partnership with Wilson at the time of this alleged interference. Nor do we know the terms of the Morris-Wilson retainer agreement—whether Wilson retained Morris for the alleged Wilson-Zeldin partnership, individually, or on some other basis.

■ In any event, all the evidence indicates that Broadbent was acting independently and out of concern for a long-time friend in urging Morris to remove himself from the case. There is absolutely no evidence that Broadbent consulted with state agents before approaching Morris or that the state was in any manner involved in this contract. While we do not hold that the government can always fall back on conventional agency principles to disclaim responsibility for acts committed by its informants, we do hold that on these unique facts no due process violation in the *Russell* sense transpired.

## IV.

■ Appellant Ryan contends that the evidence was insufficient to support the verdict against him as a coconspirator. He argues that his participation in the conspiracy can only be proved by acts committed prior to May 19, 1972, the date Mizera became a state agent, on the theory that a person cannot conspire with himself and one who is acting as a government agent is incapable of being a member of a criminal conspiracy. Accepting, *arguendo*, the appropriateness of this principle in this case, we find the evidence more than sufficient to support the verdict.

Ryan met with Mizera on numerous occasions to discuss the rezoning. At the second of these meetings, in February of 1972, campaign contributions in exchange for a favorable vote were mentioned. Ryan did not repudiate the scheme at that time, as Broadbent had done upon first becoming aware of it. Rather, he continued to meet with Mizera concerning this rezoning. While the bribe was not specifically discussed in the March meeting, it is difficult to imagine that Ryan assumed that Mizera had dropped his original proposal. In April of 1972, Ryan did repudiate the plan altogether because his share of the "kitty" had been reduced, but resumed his role in the scheme shortly thereafter, when Mizera told him that he would receive $3,000 rather than the $2,000 originally promised. Finally, on May 17, 1972, Ryan told Mizera that he would make the necessary motion at the commission meeting.

In analyzing Ryan's role in the conspiracy, it is important to keep in mind that Mizera had been rebuffed by all the other commissioners (except, of course, Broadbent, who was serving as an informant). Thus, without Ryan's cooperation with Mizera up to May 17th, the conspiracy almost certainly would have dissolved.

This court has repeatedly held that once a conspiracy is established, as it was here abundantly, only slight evidence is necessary to support a jury verdict that an individual defendant was a member. *United States v. Turner*, 528 F.2d 143, 162 (9th Cir. 1975); *United States v. Westover*, 511 F.2d 1154, 1157 (9th Cir. 1975). At the same time, we have said that mere knowledge of the existence of a conspiracy or mere association with a conspirator is insufficient to sustain a conviction. *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974). The government must show that a defendant had a "stake in the venture." *United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963). We find the evidence linking Ryan to this conspiracy considerably more than "slight" and clearly indicating a stake in the illegal venture.

Accordingly, for the reasons set forth herein, the judgment of the district court is

Affirmed.

A request for en banc consideration having been made by an active member of the court, and the matter submitted to all of the active judges, the request was rejected by a majority thereof. An order was thereupon entered denying en banc consideration. Judge Hufstedler files the following dissent from that order, in which Judge Ely joins.

HUFSTEDLER, Circuit Judge, dissenting from denial of en banc hearing with whom Judge ELY joins:

The issue is whether Mizera's consent was voluntary. If Mizera's consent was involuntary, the conversations between him and Ryan were inadmissible under 18 U.S.C. § 2511(2)(c).[1]

The district court's factual findings on this issue can be summarized as follows:[2] To secure Mizera's consent, the officers told him that they were prepared to arrest him immediately and that they had enough evidence to send him to prison for ten years. But, they suggested, if Mizera "cooperated," the prosecution would be dropped. The officers also told him that if he did not cooperate, he would lose his livelihood, damage his family, and be deprived of special medical treatments for his severe headaches. Mizera asked if he could call his lawyer. The officers said that he could do so, but if he did, the deal was off. The district court held that "consent" thus secured was "voluntary," the panel affirmed, and the court has refused to take this case en banc.

As early as 1897, the Supreme Court recognized that coercion need not take the form of physical torture:

"'But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.'" (*Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568.

And more recently:

". . . [T]he Fourth and Fourteenth Amendments require that a con-

---

1. *E. g., see Holmes v. Burr* (9th Cir. 1973) 486 F.2d 55; *United States v. Franks* (6th Cir. 1975) 511 F.2d 25; *United States v. Bragan* (4th Cir. 1974) 499 F.2d 1376.

2. The district court's factual findings are, of course, subject to the clearly erroneous standard of review. However, the district court's ultimate conclusion that the consent was voluntary rests on a legal determination of the sufficiency of the evidence to support the con-

clusion. The standard of appellate review of this determination is the same as that applied in reviewing the sufficiency of evidence to sustain a conviction. (*E. g., Channel v. United States* (9th Cir. 1960) 285 F.2d 217, 220.)

Under either formulation of the standard of appellate review, the district court's conclusion of voluntariness is unsupported and is reversible error.

sent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting consent would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854.)

The psychological pressures employed by the officers in the present case represent just such coercion comprised of threats of prosecution and long imprisonment, of the inability to receive vital medical treatment, of unauthorized promises of immunity, and of the deprivation of counsel. The methods were not as clumsy as physical torture, but they were no more subtle and every bit as effective.

The conclusion of the district court, affirmed by the panel, that this conduct was not coercive, and that the consent produced by these pressures was voluntary is flatly contrary to the controlling teachings of the Supreme Court and to the law of our Circuit. (*E. g., Lynum v. Illinois* (1963) 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (Confession secured by threats that defendant " 'could get 10 years and [that] the children could be taken away' " unless she "cooperated," held involuntary. (372 U.S. at 531, 534, 83 S.Ct. at 919) "We think it is clear that a confession made under such circumstances must be deemed not voluntary, but coerced. That is the teaching of our cases." (372 U.S. at 534, 83 S.Ct. at 920).) *Shotwell Mfg. Co. v. United States* (1963) 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357. (Evidence procured under promise of immunity "can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." (371 U.S. at 347–48, 83 S.Ct. at 453).)

*Rogers v. Richmond* (1961) 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (Uncounseled confession of defendant who was threatened that his wife would be brought in for questioning was involuntary.) *See also, United States v. Huss* (2d Cir. 1973) 482 F.2d 38; *United States v. Laughlin* (D.D.C.1963) 222 F.Supp. 264; and *McGarrity v. Wilson* (9th Cir. 1966) 368 F.2d 677, 679 ("Incriminating statements or a confession extorted by mental coercion are as involuntary as if they were obtained by violence or threats of violence.").)[3]

As Judge Duniway pointed out in *United States v. Rothman* (9th Cir. 1973) 492 F.2d 1260, 1263: "Where the consent [to a search] is obtained through a misrepresentation by the government, *Bumper v. North Carolina, supra*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 . . ., or under inherently coercive pressure and the color of the badge, *Johnson v. United States, supra*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; *United States v. Marshall*, 9 Cir. 1973, 488 F.2d 1169, 1188–1189, such consent is not voluntary." Moreover, coercion is implied when consent is obtained "under color of the badge," and the Government must show that there was no coercion in fact. (*United States v. Irion* (9th Cir. 1973) 482 F.2d 1240, 1244; *United States v. Page* (9th Cir. 1962) 302 F.2d 81, 84.)

The district court attempted to justify its conclusion that Mizera's consent was voluntary by suggesting that "voluntariness" takes on a different meaning in the context of coerced confessions than it does in the context of consent to participation in monitoring or other activities protected by the Fourth Amendment. (Although the district court found that the threatened denial of medical treatment was not coercive in the present case, it said that it would have "great concern" if the case involved a con-

---

**3.** "The human mind under the pressure of calamity, is easily seduced; and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail. A confession, therefore, whether made upon an official examination or in discourse with private persons, which is obtained from a defendant, either by the flat-

tery of hope, or by the impressions of fear, however slightly the emotions may be implanted, . . . is not admissible evidence; for the law will not suffer a prisoner to be made the deluded instrument of his own conviction.' " (*Bram v. United States* (1897) 168 U.S. at 547, 18 S.Ct. at 188.)

fession or "the waiver of a right associated with a fair trial.") This distinction is unfounded. Coercion does not evaporate with an assumed change in climate between the Fourth and Fifth Amendments. Nor does coercion become free choice when it is applied to obtain consent rather than to force a confession. (*United States v. Rothman, supra,* 492 F.2d 1260.)

The panel's effort to justify its conclusion is similarly unsuccessful. The panel postulates that the officers' threats did not induce Mizera's consent; rather, Mizera brought his plight upon himself. The officers, the panel says, simply required the defendant "to face up to the real world in order to obtain his cooperation;" that pressure is entirely appropriate, it adds, on analogy to pleas of guilty, quoting *Brady v. United States* (1969) 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747.

The panel's assumption that Mizera was guilty of a crime is unsupported by the record. Mizera has not been convicted of any crime, except by the rhetoric of the officers and the speculations of the panel. The Constitution does not give law enforcement personnel the right to decide guilt or innocence, nor does it give courts the power to make that determination with neither a guilty plea nor a trial. But even if Mizera had been guilty of the crime for which the officers threatened prosecution and conviction, his guilt would be irrelevant in deciding the coercion issue.[4] Coercion is not acceptable whether it is applied to persons who are ultimately found guilty or to those who are ultimately found innocent. Coercion is forbidden both because it is unacceptable police conduct in our justice system and because it tends to produce involuntary words and deeds. We should be ever mindful that "if we reflect carefully, it becomes abundantly clear that we can never acquiesce in a principle that condones lawlessness by law enforcers in the name of a just end." (*United States v. Huss* (2d Cir. 1973) 482 F.2d 38, 52.)

No analogy exists between the taking of a guilty plea by a court and the extraction of "cooperation" or a confession by law enforcement officers, without the presence of any judicial officer and without the presence of counsel. As Mr. Justice White said in *Brady:* "That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment." (397 U.S. at 748, 90 S.Ct. at 1468.) "Since *Gideon v. Wainwright,* 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] (1963), it has been clear that a guilty plea to a felony charge without counsel and without a waiver of counsel is invalid. [Citations omitted.]" (397 U.S. at 748–49, n. 6, 90 S.Ct. at 1469.)

The officers effectively prevented Mizera from consulting counsel after he asked to do so. That deprivation cannot be brushed aside. His need for counsel was evident.[5]

---

**4.** The panel relies on *Holmes v. Burr, supra,* where there was no question of coercion. It also uses *United States v. Lue* (9th Cir. 1974) 498 F.2d 531, and *Hampton v. United States* (1976) 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 which are entrapment cases, holding that certain law enforcement techniques that take advantage of a subject's "predisposition" are not violative of due process. Here, the fact that extreme pressure had to be used to induce cooperation belies any notion that Mizera was predisposed to cooperate.

**5.** As Mr. Justice Sutherland observed in *Powell v. Alabama* (1932) 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158:

". . . Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. . . . He requires the guiding hand of counsel at every step in the proceedings against him." (*Id.* at p. 69, 53 S.Ct. at p. 64.)

Counsel would surely have revealed to him that the officers' "compelling" statements were deceitful. The officers told Mizera that he would serve ten years, if convicted, knowing full well that ten years was the maximum penalty for Mizera's alleged misdeed. The officers also assured Mizera of conviction, although they had to know that conviction is not a certitude. Even worse, the officers offered to drop any charges against Mizera when they had no legal power to promise immunity. Consent obtained by governmental misrepresentation is involuntary. (*United States v. Rothman, supra*, 492 F.2d at 1263; *see Fuller v. United States* (1967) 132 U.S.App.D.C. 264, 407 F.2d 1199, 1213 ("Of course garnering a confession by artifice is no more permissible than achieving the same result by some cruder coercion.").)

I would en banc this case to eradicate the intra-circuit conflict between *Ryan* and *United States v. Rothman, supra*, 492 F.2d 1260, and its antecedents, and to bring *Ryan* in line with controlling Supreme Court authority. On the merits, I would reverse and remand *Ryan* for a new trial free from the tainted evidence.[6]

---

**6.** It is noteworthy that the Government's respect for Mizera's constitutional rights has been deficient in more than one instance. The panel observes that Mizera's office and residence were "bugged" prior to his grant of consent on May 19, 1972. Nevertheless, because the evidence culled from this source was said to be available from independent sources, the panel rules that its admission did not constitute error. (*United States v. Ryan*, 782 F.2d 788 at p. 548 (1976).)